## S10A1492. HUNT v. THE STATE.
### (708 SE2d 357)

HINES, Justice.

Malaika Minyon Hunt appeals her convictions for malice murder, financial transaction card theft, and theft by taking in connection with the fatal shooting of Vernon Alderman. She claims that it was error to overrule her challenge under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), and to admit into evidence at trial a prior act; she also maintains that trial counsel did not render effective assistance. Finding the claims to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed the following. On December 19, 2002, Alderman's body was discovered in the bedroom of his apartment in Gwinnett County; he was found naked and on the floor on his knees, bent over, face down, and with his hands folded over his head. He had been shot to death, and had sustained four gunshot wounds. Police found Alderman's empty holster on his kitchen counter, but they were unable to locate his handgun; nor could they find a wallet then being used by Alderman or any of his keys. The apartment was locked. Alderman had been driving his sister's gold Dodge Stratus, but that car and its keys were also missing.

Police tracked Alderman's credit cards, and on December 20, 2002, Gwinnett County police received information that one of the cards was being used at a hotel in Missouri. The Missouri authorities were told that the card owner was the victim of a homicide in Georgia and to be on the lookout for a gold Dodge Stratus which had been taken from the victim's residence. When the Missouri police arrived at the hotel, they spied the Stratus parked out in front. The officers

---

[1] The crimes occurred on December 18, 2002. On March 19, 2003, a Gwinnett County grand jury indicted Hunt for malice murder, financial transaction card theft, theft by taking, and felony murder while in the commission of aggravated assault. Hunt was tried before a jury February 26-March 8, 2007, and was found guilty of all charges. On March 14, 2007, she was sentenced to life in prison for malice murder, three years in prison for financial transaction card theft to be served consecutively to the life sentence and concurrently with the sentence for theft by taking, and ten years in prison for theft by taking to be served consecutively to the life sentence and concurrently with the sentence for financial transaction card theft; the felony murder stood vacated by operation of law. On March 14, 2007, trial counsel filed a motion for new trial on Hunt's behalf, and on February 18, 2010, new appellate counsel filed an amended motion for new trial for Hunt. The motion for new trial, as amended, was denied on March 16, 2010. A notice of appeal was filed on March 25, 2010, and the case was docketed in this Court for the September 2010 term. The appeal was submitted for decision on briefs.

spoke with the front desk clerk and learned that Hunt and another African-American woman had registered and that Hunt signed for the room.

Hunt had been involved in a sexual relationship with Alderman. One of the officers instructed the desk clerk to call the women's room, tell them there was a problem with the credit card, and to come to the front desk. The police had set up a perimeter around the hotel and they observed Hunt and her female companion, McNair, head for the back exit of the hotel. The women were stopped by the police, and Hunt was found in possession of Alderman's key ring, including keys to the Dodge Stratus and to Alderman's apartment. She had his missing credit/debit card in her purse and receipts in her pocket for purchases made with the card. Additionally, bundled up in the trunk of the Dodge Stratus, the police found a pair of Hunt's jeans and inside one pocket was a bullet consistent with those that killed Alderman; the jeans were stained in the crotch with Hunt's blood.

The police interviewed the women separately. After Hunt was advised of her *Miranda*[2] rights, she initially told the officers that she and McNair had checked into the hotel with Alderman and another man; that Alderman had used his credit card to pay for the room; that Alderman had driven to Missouri in a Ford Expedition and that she had driven the Dodge Stratus with Alderman's permission; and that Alderman had left the hotel approximately an hour before the police arrived. McNair told police that only she and Hunt made the trip from Georgia, and that there were no men at the hotel with them.

Subsequently, Hunt told Gwinnett County detectives that the situation with the credit/debit card was just a misunderstanding and that they could call Alderman and confirm that with him, and that Alderman had given her the card the previous Saturday and that she had been using it with his permission. After officers told Hunt that Alderman was dead and that Alderman had used that credit card on a day after the date that Hunt said that Alderman had given the card to her, Hunt admitted lying to the Missouri police about Alderman being in Missouri with her and that she left for Missouri on a later day. There were more variations to her story to police, but Hunt ultimately told the detectives that the last time she saw Alderman he was in his apartment with a man named "Black," that she left the men in the residence and went outside, that she heard gunshots, and then "Black" came out of the apartment.

1. The evidence was sufficient to enable a rational trier of fact to

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

find Hunt guilty beyond a reasonable doubt of the crimes for which she was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Hunt contends that the trial court erred in overruling her *Batson* challenge as the State's reasons for striking all four African-American veniremen were not race-neutral. But, she focuses her argument solely on "Juror Number 5," and urges that the State's reasoning for striking this person was completely pretextual on its face and should not have been sustained by the trial court.

> In order to show a *Batson* violation, a defendant must prove that the State purposefully engaged in racial discrimination through its use of peremptory strikes. [Cit.] On appeal, great deference must be extended to a trial court's determination that no *Batson* violation has occurred. [Cit.] Following a defendant's showing of a prima facie case of racial discrimination, the reasons provided by the State to overcome any such presumption of racial discrimination must be concrete, tangible, race-neutral, and neutrally applied.

*Woolfolk v. State*, 282 Ga. 139, 142 (3) (644 SE2d 828) (2007) (citations and punctuation omitted).

At trial, the State conceded that it had struck a sufficient number of African-American members of the venire to constitute a prima facie case under *Batson,* so that inquiry into its reasons for the strikes was warranted. The State offered three reasons for striking "Juror Number 5," which Hunt asserts were not "meaningful." However, "the striking party's burden is satisfied as long as the articulated reason is race or gender-neutral." *Rose v. State*, 287 Ga. 238, 241 (1) (695 SE2d 261) (2010).

The first reason offered for striking the woman referred to as "Juror Number 5" was that she had a cousin in prison for a violent offense and the case was still on appeal; the prosecutor had asked the venirewoman about how she felt her imprisoned cousin had been treated by the court system and she expressed no opinion, and her lack of voiced feelings in the matter made the prosecutor suspicious, rendering her a "juror, regardless of color, that [the prosecutor did not] want to have on a jury." See *Barnes v. State*, 269 Ga. 345, 349-350 (6) (496 SE2d 674) (1998). The second reason stated was that the venirewoman had a relative who was the victim of a murder, but that the murder involved a drug deal that went bad. At that point the State believed that such a scenario was going to be part of Hunt's defense, i.e., that the defense would claim that "Black" shot Alderman during a drug deal, and the State was concerned that the venirewoman would be more likely to accept such a version of the

shooting. The prosecutor said the final reason for rejecting "Juror Number 5" was the fact that the woman had "indicated she considered herself a liberal," and that the prosecutor believed that in general liberal people were less likely to convict.

Applying the required deference to the trial court's findings, it was not clearly error for it to reject the claim that the State's rationale was pretextual. *Rose v. State*, supra at 241 (2).

3. The State was permitted to present evidence that in February or March 2002, Hunt's aunt reported to police the theft of a Sig Sauer 9 millimeter handgun from her home and that she believed that Hunt was the person who had taken it; that when initially questioned by police about the missing handgun, Hunt denied having it in her possession, but that after she was arrested for theft of the handgun she wrote a note for the police officer to give to her boyfriend, with whom she lived, telling him to give that officer the missing handgun. Hunt related that the handgun was under the bed in the bedroom. Once the weapon was recovered and returned to Hunt's aunt, the aunt decided that she did not want Hunt prosecuted for the theft.

Hunt contends that the trial court erred in admitting this evidence as a similar transaction because it was not sufficiently similar to this case, there was no logical connection between the act alleged and the present charges, and the State's real purpose in introducing the evidence was to prove identification, and the evidence did not satisfy the requirements for use for that purpose. But, the contentions are unavailing.

The State's express purpose in seeking the admission into evidence of the prior act was to demonstrate Hunt's bent of mind and course of conduct. After conducting a hearing in the matter as to whether the State made the required affirmative showings, see *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991), the trial court granted the State's motion to allow it to introduce evidence of the earlier handgun theft. And, a trial court's decision to admit evidence of a similar transaction is to be upheld absent an abuse of discretion. *Moore v. State*, 288 Ga. 187, 190 (3) (702 SE2d 176) (2010).

In the consideration of the admissibility of similar transaction evidence, the focus is properly on the similarities, and not the differences, between the act in question and the incident on trial. And there were similarities in this case. In both the earlier theft and the murder, Hunt stole 9 millimeter handguns from individuals with whom she had a close relationship and access, and then she lied to police in order to avoid arrest and prosecution. If the admitted purpose of the similar transaction evidence is to show bent of mind or course of conduct, a lesser degree of similarity is required than

when such evidence is introduced to prove identity. *Barnes v. State*, 287 Ga. 423, 426 (3) (696 SE2d 629) (2010). And, there is no requirement that the earlier act have resulted in a formal criminal charge, prosecution, or conviction. *Brown v. State*, 201 Ga. App. 473, 474 (2) (411 SE2d 360) (1991). The trial court's decision to admit the evidence of the prior handgun theft cannot be found to be an abuse of its discretion. *Moore v. State*, supra at 190 (3).

4. Finally, Hunt contends that the trial court erred in concluding that trial counsel did not render ineffective assistance of counsel by failing to have voir dire taken down by a court reporter. The gravamen of Hunt's complaint is that counsel's decision to forego such recordation effectively deprived her of the opportunity to have such a critical stage of the trial process reviewed for error, specifically precluding a full review of the questioning of the venirepersons in regard to the unsuccessful *Batson* challenge.

In order to prevail on her claim of ineffectiveness, Hunt has to demonstrate that her attorney's performance was deficient and that such deficiency so prejudiced her that a reasonable probability exists that, but for the deficiency, the outcome of her trial would have been different; in doing so she has the burden of overcoming the strong presumption that counsel's actions fell within the broad range of professional conduct. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Futch v. State*, 286 Ga. 378, 380 (2) (687 SE2d 805) (2010).

At trial, Hunt was represented by two lawyers. Lead counsel testified at the hearing on the motion for new trial, as amended, that he made the decision not to record voir dire because he knew that the court reporter frequently interrupted, and that he believed that such interruptions would make voir dire less effective, i.e., that the defense had a greater chance of picking a better jury for Hunt without the anticipated interruptions. He further explained that in any event, if an issue or problem arose during voir dire, like the *Batson* challenge, then he would have the court reporter take it down at that time, which is what occurred at trial. Even assuming that the decision not to record voir dire is deemed outside the range of reasonable trial strategy, see *Dockery v. State*, 287 Ga. 275, 277 (5) (695 SE2d 599) (2010), that is not the end of the inquiry; Hunt must show prejudice. *Smiley v. State*, 288 Ga. 635 (706 SE2d 425) (2011).

"[A] general unspecified hope of reversible error during voir dire" will not secure a defendant another trial "on the ground that a record should have been made so as to accommodate a search for error now buried in unrecorded history." (Punctuation and footnote omitted.) *Williams v. State*, 285 Ga. App. 190, 194-195 (3) (b) (645 SE2d 676) (2007). Mere speculation will not satisfy the prejudice prong of *Strickland*. *Devega v. State*, 286 Ga. 448, 450 (4) (a) (689

SE2d 293) (2010). Hunt has failed to establish that a *Batson* violation, or any other irregularity, occurred. See *Davis v. State*, 264 Ga. App. 221, 228 (6) (590 SE2d 192) (2003). Specifically as to review of the *Batson* challenge with regard to "Juror Number 5," and appellate counsel's ability to pursue it on appeal, the record reveals no dispute at trial about the questioning and responses with respect to "Juror Number 5." See Division 2, supra. Furthermore, trial counsel testified at the hearing on the amended motion for new trial, that even though voir dire was not officially recorded, co-counsel's primary duty was to take notes throughout trial, including voir dire, and that all the notes and other legal work by defense counsel on the case, which generated 13 legal boxes of documents, were turned over to appellate counsel. Simply, prejudice has not been shown, and therefore, the claim of the ineffectiveness of trial counsel must fail. *Smiley v. State*, supra.

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 18, 2011.

*Jennifer M. Daniels*, for appellant.

*Daniel J. Porter, District Attorney, Kimberly A. Gallant, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.