311 Ga. 531
FINAL COPY

S21A0318. MATTHEWS v. THE STATE.

ELLINGTON, Justice.

A jury found Freeman Matthews guilty of malice murder, battery, and possession of a knife during the commission of a crime in connection with the stabbing death of Adrianne Young and also found him guilty of financial transaction card theft and obstruction of an officer.[1] On appeal, Matthews challenges the sufficiency of the

---

[1] The crimes occurred on April 11, 2009, except for the obstruction of an officer, which occurred on April 16, 2009. A Cobb County grand jury returned an indictment against Matthews and LaRoyce Garnto for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on armed robbery (Count 3), aggravated assault (Count 4), armed robbery (Count 5), financial transaction card theft (Count 6), four counts of possession of a knife during the commission of a crime (Counts 7 through 10), battery (Count 11), stalking (Count 12), and three counts of obstruction of an officer (Counts 13 through 15). Following a joint trial that ended on March 3, 2010, the trial court directed a verdict of not guilty as to Count 12 against Matthews and as to all counts against Garnto. A jury then found Matthews guilty on Counts 1, 2, 4, 6 through 9, 11, and 13 through 15, and not guilty on the remaining counts. The trial court sentenced Matthews to life in prison for Count 1, five years in prison for Count 7, to run consecutively to Count 1, and two years for Count 6 and 12 months for Counts 11 and 13 through 15, to run concurrently with the life sentence. Counts 4, 8, and 9 merged. The judgment indicated that the felony murder count (Count 2) merged with the murder

evidence and contends that the trial court erred in admitting his custodial statement and excluding evidence that pointed to a third-party suspect. Matthews also contends that he received ineffective assistance of counsel. For the reasons explained below, we affirm.

Viewed in the light most favorable to the jury's verdicts, the evidence shows the following.

*Evidence from the crime scene.* At around 10:15 p.m. on April 11, 2009, a passerby called 911 when she discovered Young lying face down in a pool of blood in the parking lot outside Young's apartment in the Mission at Galleria apartments in Smyrna. At that point, Young was making a gurgling sound. A Smyrna police officer arrived a few minutes later and found that Young was not breathing and did not have a pulse.

The responding officer found a bent, serrated knife blade with

conviction, although it was actually vacated by operation of law. See *Bradley v. State*, 305 Ga. 857, 857 n.1 (828 SE2d 322) (2019). Matthews filed a timely motion for a new trial, which he amended on January 20, 2011, and November 25, 2014. The trial court conducted a hearing on the motion on March 2, 2015, and denied the motion on February 20, 2019. Matthews filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2020 and submitted for a decision on the briefs.

no handle lying on Young's back close to her neck. The blade appeared to have been part of a steak knife. Young had bloody wounds on the top and back of her head and multiple stab wounds to her chest and shoulders. There was a set of Acura car keys near Young's body. The officer used the keys to locate Young's Acura in a parking space near Young's body. The grill and hood of the car were still warm 15 to 20 minutes after the responding officer arrived at the crime scene. Investigators found near Young's body a plastic shopping bag containing a Walmart receipt, a package of apples, the separate top and bottom halves of a jewelry box, and a pair of earrings. However, no purse or wallet was found at the scene.

*Autopsy*. During an autopsy, a medical examiner found a total of 11 stab wounds to Young's upper chest, upper back, shoulders, and the back and top of her head. One four-inch-deep wound entered below Young's right collar bone; the aorta and the sac around the heart were lacerated. The medical examiner estimated that this wound would have caused death within about ten minutes. Three other wounds to her back and shoulders were three to four inches

3

deep. The knife blade found on Young's body was long enough to inflict the wounds. There was also a bruise on Young's face and another on her throat.

*Use of Young's debit card.* Investigators determined that, at 10:50 p.m. on the night Young was killed, while officers were still processing the crime scene, a transaction was attempted using Young's Bank of America debit card at an ATM in a Citgo convenience store on Concord Road in Smyrna. As recorded by the store's surveillance cameras, at 10:49 p.m. that night, two men entered the parking lot on foot. One of the men, who was wearing a black and white cap with a distinctive hexagonal logo, went to the ATM and interacted with the machine for about one minute. The two men then left the store.

*Matthews's arrest and confession.* The convenience store's security video showing the two men was released to the local news media a few days after the murder, and a still photograph clipped from the video was published in the local newspaper. The maintenance supervisor at the Concord Chase apartments in

Smyrna saw the photo, called the Smyrna police, and identified the men in the photo as residents of Apartment 2406 at Concord Chase.

On April 16, the maintenance supervisor called the police again and reported seeing movement in Apartment 2406. Investigators and officers staked out the apartment while awaiting a search warrant. At approximately 1:00 p.m., Matthews and LaRoyce Garnto ran out the back door. Garnto immediately submitted to being arrested by the officers; Matthews ignored officers' commands to stop and ran away. Several officers surrounded him, and, when he did not comply with commands to get on the ground, one officer forced him to the ground. Matthews resisted being handcuffed and yelled, "I know I'm going to be gone a long time; shoot me, shoot me."

An investigator questioned Matthews for several hours, ending just after midnight. An audio-video recording of the last two hours of the interview was played at trial. In that recorded interview, after initially denying being at the scene at all and then recounting events to place all of the blame on Garnto, Matthews stated the following. Before Young's death, Matthews had been dating her, and she had

also been dating another man named Robert. Matthews and Young argued about her other relationship, and she told Matthews that she wanted to break up with him. On the night Young died, Matthews and Garnto took a bus to Cumberland Mall, which was near Young's apartment complex. They walked to the parking area outside Young's apartment and were standing there when Young drove up and parked. She had a plastic bag and a package of apples. Matthews confronted Young about her breaking off their relationship. Young cursed Matthews, and he hit her in the face and the throat. Young fell to the ground, and they struggled. Matthews stabbed her in the chest with a serrated knife with a brown handle. Matthews and Garnto walked home, stopping at the Citgo convenience store on Concord Road, where they unsuccessfully tried to use Young's debit card at the ATM.

At trial, the investigator who interviewed Matthews testified that certain details that Matthews volunteered, including that Young was attacked in the parking lot, that there was a plastic container of apples at the scene, and that she was stabbed in the

6

chest, had been withheld from the public.

*Physical and location evidence.* After arresting Matthews and Garnto, investigators executed a search warrant of their apartment. In the kitchen, they found four brown-handled steak knives of the same size, type, and manufacturer as the knife blade found on Young's body. In a dumpster adjacent to the apartment building, investigators found a trash bag that contained a black and white cap with the same logo as the one worn by one of the men in the Citgo security video. The bag also contained two of Young's Bank of America debit cards, one of her credit cards, a traffic citation she had received, and other documents with her name on them, mingled with correspondence addressed to Matthews at 2406 Spring Brook Trail.

Regarding the relative location of Matthews's and Garnto's apartment, the Citgo convenience store where Young's debit card was used shortly after she was stabbed, and Young's apartment, an investigator testified as follows: traveling between Matthews's apartment and Young's apartment along the main road (Concord

Road/Spring Road) is a distance of about four miles. The Citgo convenience store on Concord Road is along that route and a short walk from Matthews's apartment. The two men who were at the Citgo convenience store attempting to use Young's debit card entered and left the property on foot in the direction of the direct route from Young's apartment to Matthews's apartment along the main road.

Another investigator testified as follows. Matthews's cell phone records, including cell tower and sector data, show that, at 8:44 p.m. on the evening Young was killed, Matthews's phone was in the area served by the cell tower nearest Matthews's apartment. Then, Matthews's phone traveled east along Concord Road/Spring Road and by 9:37 p.m. was in the area served by a cell tower near Cumberland Mall. By 11:11 p.m., Matthews's phone had traveled west along Concord Road/Spring Road and returned to the area of Matthews's apartment.

*Matthews's relationship with Young.* Cheryl Young, the victim's mother, testified as follows. She and her daughter were very

8

close, and they confided in each other. A few days before Young was fatally stabbed, she told her mother that she was changing her phone number "because [men] just didn't want to understand that, when she says she is through, it was over and she didn't want to have anything to do with them." Young told her mother that she was having difficulties with someone, and "the guy [Young] mentioned, his name was Freeman." Young's mother did not know if Freeman was the last name or first name, but "that is what [Young] would always say, 'Freeman.'"

Robyn Hollis testified as follows. Young and Hollis had been friends for five or six years at the time of Young's death. Hollis considered Young a close friend, and they would confide in each other about things that were going on in their lives. Before her death, Young mentioned having meals with "her guy Freeman" to Hollis. The day before her death, Young told Hollis that she had gotten a new phone number. When Hollis asked Young why she was changing her number, Young said, "Because when I tell these [men] that I am through with them, I am just through with them. . . . I am

just done, and he don't understand that." Although Young did not refer to Matthews by name in that conversation, Hollis understood that she was talking about Matthews because she knew they were seeing each other and because she knew Young and "when she is messing with one guy, she is only messing with that one guy. She does not play around."

Pat Schaffner testified as follows. Young had worked as a caregiver for Schaffner's husband for about eight-and-a-half years at the time of her death. Young would also spend time with the family when she was off duty, including babysitting for the Schaffners' grandsons. Schaffner regarded Young as a member of the family who cared for the family "like a mother hen." The week before her death, Young told Schaffner that she had changed her cell phone number. Young explained that she was having difficulty with a man who wanted to date her, but she was not interested and had told him so. Young said that the man had been calling and bothering her, and he had also found the Schaffners' phone number and was calling their house. Two days later, Schaffner received a phone call

around 10:00 p.m. from a man who identified himself as "Detective Williams" with the Cobb County police. The caller said that he was looking into a domestic matter involving Young and needed Young's phone number. Schaffner gave the caller Young's new cell phone number, and she made a note of the caller's name and number displayed on her caller ID. When Young came to work the next day, Schaffner told her about the incident, and Young said that it was probably one of her friends playing a joke and that she was not concerned because "he already had gotten her new number." Young did not say who "he" was. After Young's death, Schaffner told a detective who was investigating Young's murder about the call and gave him the number and the name that she had seen on caller ID: Damarah Gray.

Damarah Gray testified that, in April 2009, Matthews was her boyfriend. A few days before Young was killed, Matthews called Gray and asked her to add a third number to the call. Gray did as Matthews asked, but she did not listen to the conversation between Matthews and the other person.

Matthews was indicted and tried jointly with Garnto. Neither defendant testified at trial.

1. Matthews contends that the evidence presented at trial was insufficient for a rational jury to find him guilty beyond a reasonable doubt of the crimes arising from the attack on Young and the attempted use of her debit card on April 11, 2009: malice murder, possession of a knife, financial transaction card theft, and battery.[2]

When this Court evaluates the sufficiency of the evidence as a matter of due process under the Fourteenth Amendment of the United States Constitution, the standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to

---

[2] Matthews makes no argument that the evidence was insufficient to support his convictions for obstruction of an officer in connection with his arrest on April 16, 2009, and this Court no longer routinely reviews sua sponte the sufficiency of the evidence in direct appeals in non-death penalty murder cases. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020).

12

the jury's assessment of the weight and credibility of the evidence." *Harper v. State*, 298 Ga. 158, 158 (780 SE2d 308) (2015) (citation and punctuation omitted).

In addition to Matthews's admission that he stabbed Young, his cell phone records and his knowledge of information about the crime scene that the police had deliberately withheld from the public supported a finding that he was present when the crime occurred. Evidence found in his home and in the adjacent dumpster, including the set of steak knives that matched the knife blade found on Young's body, Young's debit and credit cards, and the cap that one of the men using Young's debit card was wearing just after the murder, also connected him to the crimes. The evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Matthews was guilty of malice murder and possession of a knife during the commission of a crime.[3] See *Jackson*,

---

[3] See OCGA § 16-11-106 (b) (1) ("Any person who shall have on or within arm's reach of his or her person . . . a knife having a blade of three or more inches in length during the commission of . . . [a]ny crime against or involving the person of another . . . and which crime is a felony, commits a felony[.]").

443 U. S. at 319 (III) (B); see also *Johnson v. State*, 296 Ga. 504, 505 (1) (769 SE2d 87) (2015) (evidence sufficient despite the lack of physical evidence connecting the defendant to the crime, the inconsistent and unreliable nature of the eyewitness testimony, and the existence of other suspects who could have committed the murder); *Payne v. State*, 273 Ga. 317, 318 (1) (540 SE2d 191) (2001) (evidence sufficient despite lack of any eyewitness testimony that defendant stabbed victim).

Count 6 of the indictment charged Matthews with knowingly taking without consent a Bank of America Visa debit card, which was "issued to Adrianne Young as cardholder and from whose possession the said card was taken." A rational trier of fact could find beyond a reasonable doubt that Matthews was guilty of financial transaction card theft from the evidence presented, including evidence that debit cards and a credit card belonging to Young were found in the dumpster adjacent to Matthews's residence, that Young's purse was missing from the crime scene, and that Matthews attempted to use Young's debit card within an hour

14

of her murder. See *Jackson*, 443 U. S. at 319 (III) (B); see also *Powell v. State*, 289 Ga. 901, 902 (717 SE2d 215) (2011); *Hunt v. State*, 288 Ga. 794, 795-796 (1) (708 SE2d 357) (2011).

Count 11 charged Matthews with intentionally causing "visible bodily harm to Adrianne Young by striking her about the face thereby causing an abrasion to her face." Matthews admitted during his custodial statement that he hit Young in the face and knocked her down. The medical examiner who performed Young's autopsy noted a bruise on her face that was consistent with being hit by a fist or striking the ground after falling. The evidence was sufficient to support Matthews's battery conviction. See *Jackson*, 443 U. S. at 319 (III) (B).

2. Matthews contends that the trial court erred by granting the State's motion to exclude evidence of another suspect. A criminal defendant may "introduce . . . evidence implicating another person in the commission of the crime or crimes for which the defendant is being tried" only when the proffered evidence

raise[s] a reasonable inference of the defendant's

15

innocence[ and either] . . . directly connect[s] the other person with the corpus delicti[ ] or show[s] that the other person has recently committed a crime of the same or similar nature. Evidence that merely casts a bare suspicion on another or raises a conjectural inference as to the commission of the crime by another, is not admissible.

*Heard v. State*, 295 Ga. 559, 567-568 (4) (761 SE2d 314) (2014) (citation and punctuation omitted). This Court reviews a trial court's decision whether to admit evidence, including evidence tending to show that another person committed the crime for which the defendant is tried, for abuse of discretion. *Gilreath v. State*, 298 Ga. 670, 673 (2) (784 SE2d 388) (2016).

The State moved in limine to prohibit Matthews from introducing evidence that Robert Miller might have committed the crimes. At a hearing before trial, an investigator involved in the case testified as follows. At the outset of the investigation, he obtained Young's apartment lease. She had listed "Robert Miller" as the emergency contact. The investigator, with others, went to Miller's house, arriving at about 1:30 a.m. on April 12, about three hours after Young was fatally stabbed. Miller's wife answered the door and

16

had to wake Miller up. Miller stated that he had had an affair with Young but stated that he had been home all day on April 11 with his family. Miller's wife and children all stated that Miller had been home all day. Miller's wife was surprised to hear of Young's death and commented that, although it had not been "the greatest circumstances" when she met Young, given Young's affair with Miller, she still thought that "Miss Young was a nice woman." The investigator looked to see whether Miller had any marks suggesting that he sustained an injury to his hands, arms, face, head, or chest in the course of engaging in some type of struggle or fight; the investigator saw no such marks. The investigator did not pursue Miller as a suspect.

At the pretrial hearing on the State's motion in limine, Matthews testified that he and his friend, Avery Clark, spent the evening of April 11 at Cumberland Mall and then went to a gas station at the corner of Cumberland Boulevard and Spring Road, near Young's apartment, where, at 10:15 p.m., they saw Garnto entering Miller's car, which Matthews recognized. Matthews did not

17

proffer any evidence that Miller had committed any crime similar to the attack on Young. Matthews's counsel stated that he had not yet had an opportunity to interview Miller but anticipated having him available to testify at trial. Based on the proffered evidence, the trial court granted the State's motion in limine to exclude evidence about Miller, stating a willingness to reconsider the admissibility of the evidence if Matthews's counsel, after talking to Miller, was able to proffer something more to show that the evidence could support a reasonable inference of Matthews's innocence.

At trial, before cross-examining the investigator who testified at the pretrial hearing about his contact with Miller and his family, Matthews's counsel informed the court that he had Miller, whom Matthews "insisted was the assailant," available to testify but, after Matthews's possible alibi defense involving Clark "didn't work out," counsel did not anticipate calling Miller as a witness.

Matthews did not take the opportunity to later supplement the evidence elicited at the pretrial hearing, and that evidence did not directly connect Miller with the fatal stabbing, nor did it show that

18

Miller had recently committed a crime of the same or similar nature. The proffered evidence, at best, casts a bare suspicion on Miller, and, therefore, the trial court did not abuse its discretion in granting the State's motion in limine to exclude evidence implicating Miller. See *Elkins v. State*, 306 Ga. 351, 358-359 (2) (b) (830 SE2d 217) (2019); *De La Cruz v. State*, 303 Ga. 24, 28 (3) (810 SE2d 84) (2018).

3. Matthews contends that the trial court erred in admitting his confession, which he argues was not given of his own free will but was "the product of police deception and brutality." Matthews argues that admitting his confession violated his Fifth Amendment right not to be compelled to incriminate himself. In addition, Matthews argues that his confession was inadmissible under a Georgia statute that requires exclusion of any confession induced by a hope of benefit or a fear of injury.

With regard to police deception, the investigator who interviewed Matthews told him during the course of the interview that his DNA, and not Garnto's DNA, had been found on Young's body. The investigator also told Matthews that a cab driver had

19

reported driving him and Garnto home on the night of the murder and that the contours of his knuckles, but not Garnto's knuckles, matched the bruise on Young's face. At the pretrial hearing on Matthews's motion to exclude his custodial statement, the investigator testified that he knew that these items of evidence did not actually exist. Matthews did not testify about the investigator's misrepresentations.

With regard to police brutality, Matthews testified at the pretrial hearing that one of the arresting officers hit him in the mouth and, after he was transported to the jail, officers "jumped on" him and beat him up and threw him in a cell, leaving him with a sprained and swollen wrist.[4] Matthews testified that, while the lead investigator was escorting him to the interrogation room, he told the investigator that he had just been beaten up. Matthews also testified

---

[4] In his appellate brief, Matthews refers to the trial testimony of one of the arresting officers that Matthews resisted being handcuffed and so the officer "began applying pressure to his right hand and right wrist" to get "a little pain compliance" from Matthews. At the pretrial hearing on Matthews's motion to suppress, however, Matthews testified affirmatively that his wrist was not injured in the course of his arrest and insisted that his wrist was injured at the jail.

that he was transferred from the Smyrna jail to the Cobb County jail after the interrogation and that Cobb County personnel refused to book him until he was taken to the hospital, where he was treated for a sprained wrist. The investigator, on the other hand, testified that he was present when Matthews was arrested on April 16, that there was no abuse by the officers, that Matthews had no injuries at all at the beginning of the interrogation later that afternoon, that Matthews had no injuries at the conclusion of the interrogation, and that Matthews never complained about any injury while he was in Smyrna Police Department custody. The investigator did not remember taking a bathroom break during the interrogation, but he testified that Matthews would have been allowed a break if he said he needed one.

(a) Matthews contends that under the totality of the circumstances his confession was not the product of free choice, citing *Frazier v. Cupp*, 394 U. S. 731, 739 (II) (89 SCt 1420, 22 LE2d 684) (1969), *Bram v. United States*, 168 U. S. 532 (18 SCt 183, 42 LE 568) (1897), and *United States v. Lall*, 607 F3d 1277 (11th Cir. 2010).

In determining whether a defendant's statement was voluntary as a matter of constitutional due process,

> a trial court must consider the totality of the circumstances. The State bears the burden of demonstrating the voluntariness of a defendant's statement by a preponderance of the evidence. In reviewing such a mixed question of fact and law, we accept the trial court's finding on disputed facts and credibility of witnesses unless clearly erroneous but independently apply the law to the facts.

*Welbon v. State*, 301 Ga. 106, 109 (2) (799 SE2d 793) (2017) (citations omitted).

After hearing from both the investigator who conducted the interview and from Matthews and making determinations of credibility, the trial court found that the State carried its burden of showing that Matthews's statement was given willingly and voluntarily. The trial court's determination that the investigator's testimony was more credible than Matthews's on the issue of the alleged brutality was not clearly erroneous. And, although the investigator lied about the evidence, he did nothing to suggest that a confession would not be used against Matthews. After

independently applying the law to the facts, we likewise conclude that, under the totality of the circumstances, Matthews's statement was voluntary as a matter of constitutional due process. See *Frazier*, 394 U. S. at 739 (II) (The fact that the police represented falsely that another suspect had confessed was relevant to the issue of voluntariness but insufficient under the totality of the circumstances to make the suspect's otherwise voluntary confession inadmissible.); *State v. Troutman*, 300 Ga. 616, 619 (2) (797 SE2d 72) (2017) (A suspect's custodial statement was voluntary under the totality of the circumstances, where there was no evidence of excessively lengthy interrogation, physical deprivation, brutality, deception or other type of deliberate tactics calculated to break the will of the suspect.); *Drake v. State*, 296 Ga. 286, 290 (3) (766 SE2d 447) (2014) (A suspect's statement was voluntary under the totality of the circumstances, which included interrogating officers' pleas to him throughout the interviews to tell the truth; their exaggerations of the incriminating evidence the police had gathered; their false representation that the victim had survived the shooting; their

insistence that they wanted to "help" the suspect; and the absence of evidence of excessively lengthy interrogation, physical deprivation, brutality, or other coercion.).[5]

(b) Matthews contends that his confession was induced by another by a hope of benefit or fear of injury engendered by the investigator's trickery and by other officers' alleged physical abuse. He argues that his confession was therefore inadmissible under former OCGA § 24-3-50 ("To make a confession admissible, it must

---

[5] See also *Oregon v. Elstad*, 470 U. S. 298, 317 (III) (105 SCt 1285, 84 LE2d 222) (1985) (discussing the absence of precedent that "the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case"); *United States v. Farley*, 607 F3d 1294, 1328-1329 (III) (C) (1) (11th Cir. 2010) ("Generally, courts have held statements involuntary [under the constitutional standard] because of police trickery only when other aggravating circumstances were also present. Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary. By contrast, statements have been held involuntary where the deception took the form of a coercive threat," such as a threat to cut off a suspect's welfare benefits and take her children away if she did not cooperate, "or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them," such as telling a suspect that having a lawyer present would be a disadvantage or that signing a waiver form would not hurt him. (citations omitted)); *Lall*, 607 F3d at 1290-1291 (II) (B) (Where a suspect confessed after an investigator told the suspect that anything he said would not be used to prosecute him and that he did not need a lawyer, the confession was not voluntary under the totality of the circumstances.).

24

have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury.").[6]

In contrast to Matthews's constitutional argument, which presents the broader question whether his confession was inadmissible on the basis that it was not voluntary under the totality of the circumstances, his statutory argument involves "a narrowly focused test" that presents "a single question" targeted at "the reliability — the truth or falsity — of [his] confession[.]" *State v. Chulpayev*, 296 Ga. 764, 779 (3) (b) (770 SE2d 808) (2015) (recognizing that, although the tests for determining the voluntariness of a confession under OCGA § 24-8-824 or former OCGA § 24-3-50 and under the Constitution are not the same, our decisions have sometimes conflated the analysis of whether a

---

[6] Because Matthews was tried before January 1, 2013, Georgia's former Evidence Code applies in this case. See *Graves v. State*, 298 Ga. 551, 553 n.2 (783 SE2d 891) (2016). This text was carried forward in nearly identical language in our current Evidence Code as OCGA § 24-8-824, which provides: "To make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." See *Price v. State*, 305 Ga. 608, 610 (2) n.2 (825 SE2d 178) (2019) (there is no substantive difference between former OCGA § 24-3-50 and OCGA § 24-8-824).

25

confession is voluntary under the two different standards). "This Court has consistently interpreted the phrase 'slightest hope of benefit' not in the colloquial sense, but as it is understood in the context within the statute, focusing on promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Mann v. State*, 307 Ga. 696, 701 (2) (c) (838 SE2d 305) (2020) (citation and punctuation omitted). "As for 'remotest fear of injury,' it is physical or mental torture that prevents a confession from being admissible" under former OCGA § 24-3-50. *Price v. State*, 305 Ga. 608, 610 (2) (825 SE2d 178) (2019) (citation and punctuation omitted). See also *Turner v. State*, 296 Ga. 394, 395-396 (2) (768 SE2d 458) (2015) (same). Under the standard of review applicable to a trial court's decision regarding admissibility under the statutory standard, the reviewing court accepts the trial court's determinations as to the credibility and weight of conflicting evidence unless they are clearly erroneous and independently reviews the trial court's application of the law to the facts. See *Chulpayev*, 296 Ga. at 771 (2) n.5. De novo review is appropriate,

however, if the controlling facts can be definitively ascertained, exclusively by reference to evidence, such as a recording of a police interview, that is uncontradicted and presents no questions of credibility. See id.

In terms of a hope of benefit, Matthews argues that the investigator's lie that the police had DNA evidence to prove that he committed the crime was calculated to elicit a false confession, because he was deceptively presented with "no way out" except "to admit being at the scene but deny full responsibility." It is well established, however, that artifice and deception by an interrogating officer do not render a suspect's statement inadmissible under OCGA § 24-8-824 or former OCGA § 24-3-50 as long as they are not calculated to procure an untrue statement. See *Mann*, 307 Ga. at 702 (2) (c); *Drake*, 296 Ga. at 290 (3); *Johnson v. State*, 295 Ga. 421, 425 (2) (761 SE2d 13) (2014). In particular, a mere overstatement by an interrogating officer as to how much inculpatory evidence he possessed at the time of questioning does not ordinarily affect the admissibility of a suspect's statement under the statutory standard.

27

See *Johnson*, 295 Ga. at 425 (2).

Even if the investigator led Matthews to believe that the evidence was so strong that he could not plausibly deny having been at the scene, as he contends, he has not shown that the investigator's deception was calculated to procure an untrue confession. As we can definitively ascertain from the recording of the interview, the investigator repeatedly confronted Matthews with photos of Young, brutally murdered, and asked why that had to happen to her. The investigator also continually challenged Matthews to stop lying and to just tell the truth about what happened to Young. Comments conveying the seriousness of a suspect's situation and exhortations or encouragement to tell the truth do not constitute a hope of benefit under the statutory standard. See *Dawson v. State*, 308 Ga. 613, 618 (3) (842 SE2d 875) (2020); *Reed v. State*, 307 Ga. 527, 533 (2) (a) (837 SE2d 272) (2019). Nor was there any evidence that the investigator ever indicated that a confession would result in any leniency in charges or sentencing such as would amount to an improper hope of benefit. See *Dawson*, 308 Ga. at 618-622 (3); *Reed*, 301 Ga. at 532-

534 (2) (a). The investigator's overstatement as to how much inculpatory evidence he possessed at the time of questioning did not constitute offering a hope of benefit to induce a confession. See *Mann*, 307 Ga. at 702-703 (2) (c) (Where investigators falsely told a suspect that the child battery victim, who was unconscious when the suspect called 911, had woken up and had said that the suspect was responsible for his injuries, the suspect's resulting belief that he would not be charged with murder did not make his statement, in which he described how he had physically disciplined the child, inadmissible under OCGA § 24-8-824 as having been induced by a hope of benefit.); *Johnson*, 295 Ga. at 425 (2) (Where an interrogator falsely claimed that DNA evidence connected the suspect and the murder victim to the murder weapon and suggested that the suspect would be well served by offering his version of events, the suspect's statement was not inadmissible under former OCGA § 24-3-50 as having been induced by a hope of benefit.).[7]

---

[7] Matthews argues that the police deception in this case was calculated to elicit an untrue statement, citing *State v. Ritter*, 268 Ga. 108 (485 SE2d 492)

In terms of a fear of injury, Matthews contends that he was physically injured by officers before being interviewed and was subjected to a lengthy interrogation without any bathroom break. See *State v. Lynch*, 286 Ga. 98, 100 (1) (686 SE2d 244) (2009) (affirming suppression of a confession obtained after a suspect was beaten and after investigators promised that the suspect would receive medical attention only if he gave a statement). In this case, the trial court was entitled to credit the investigator's testimony over Matthews's as to whether Matthews had been beaten. See *Love v. State*, 309 Ga. 833, 838 (2) (848 SE2d 882) (2020); *Coppock v. State*, 273 Ga. 324, 324 (2) (540 SE2d 187) (2001). The trial court's finding that Matthews was not beaten is not clearly erroneous, and we accept that determination. And there was no evidence that he

(1997). The facts in *Ritter* are distinguishable from those in this case. In *Ritter*, the investigator told the defendant that he thought the beating victim would be "okay" except for a bad headache, when the investigator knew the victim had already died and the investigator had obtained a warrant to arrest the defendant for murder. See id. at 109. To the extent that we held in *Ritter* that the defendant's statement was inadmissible under former OCGA § 24-3-50 as having been induced by a hope of benefit, specifically, the hope of receiving a lighter punishment for aggravated assault than the defendant actually faced for murder, we continue to have serious doubts as to whether *Ritter* was rightly decided. See *Dawson*, 308 Ga. at 622 (3) n.9; *Mann*, 307 Ga. at 702 (2) (c) n.4.

was denied a bathroom break, as he claims. In addition, Matthews's statements, demeanor, and movements as shown in the recording of the interview support the conclusion that Matthews's confession was not induced by any brutality or deprivation before or during the interview or by any perceived threat of future injury. See *Mangrum v. State*, 285 Ga. 676, 678 (2) (681 SE2d 130) (2009) (holding that a custodial statement was not involuntary as having been induced by a fear of injury, where the suspect gave the statement after a detective suggested that the suspect might be safer remaining in police custody).

Consequently, Matthews's argument that his confession was inadmissible under former OCGA § 24-3-50 as having been induced by a hope of benefit or fear of injury lacks merit.

4. Matthews contends that his trial counsel rendered ineffective assistance by failing to object to certain testimony.

To succeed on his claim of ineffective assistance of counsel, Matthews "must prove both that his lawyer's performance was professionally deficient and that he was prejudiced as a result."

31

*Styles v. State*, 309 Ga. 463, 471 (5) (847 SE2d 325) (2020) (citation and punctuation omitted). See also *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

(a) Matthews contends that his trial counsel rendered ineffective assistance of counsel by failing to object to hearsay testimony elicited from Young's mother, employer, and two friends about Young's statements, because the State failed to show particularized guarantees of trustworthiness as required by the former necessity exception to the rule against hearsay. Specifically, Matthews argues that the State failed to show that the witnesses were Young's confidantes, and he argues that the statements were not probative evidence that, as the State argued, Young meant to convey to the witnesses that she and Matthews had a troubled relationship.

> To have hearsay evidence admitted under the necessity exception of the [former] Evidence Code,[8] the

---

[8] The hearsay statute of the former Evidence Code, former OCGA § 24-3-1, provided:

> (a) Hearsay evidence is that which does not derive its value solely from the credit of the witness but rests mainly on the

proponent of the evidence had to establish a necessity for the evidence, a circumstantial guaranty of the statement's trustworthiness, and that the hearsay statements were more probative and revealing than other available evidence. The trial court's admission of hearsay evidence under the necessity exception is evaluated under an abuse of discretion standard.

*Taylor v. State*, 308 Ga. 57, 59 (2) (838 SE2d 774) (2020) (citations and punctuation omitted). See also *Brown v. State*, 278 Ga. 810, 811 (2) (607 SE2d 579) (2005) ("The first requirement [of the necessity exception] is satisfied [when] the declarant is deceased.").

Concerning trustworthiness, "we have held that a statement is trustworthy when made to someone with whom the declarant enjoys a close personal relationship." *Taylor*, 308 Ga. at 60 (2) (citation and punctuation omitted). Each of the witnesses at issue here described a close, confidential relationship with Young. And there was no indication that Young's statements to the witnesses were fabricated or lacking in veracity. Thus, the State made a sufficient showing of trustworthiness. See id. at 59 (2). And Young's statements to her

veracity and competency of other persons.
(b) Hearsay evidence is admitted only in specified cases from necessity.

33

confidantes were more probative of the state of her relationship with Matthews than other available evidence. Any objection would have been futile, and "[t]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." *White v. State*, 307 Ga. 882, 889 (3) (c) (838 SE2d 828) (2020) (citation and punctuation omitted).

(b) Matthews contends that his trial counsel rendered ineffective assistance in failing to object on hearsay grounds to the following exchanges during an investigator's testimony:

> PROSECUTOR: [Did] releasing the stills from the video and the video itself . . . bring about any action or reaction from the public?
> WITNESS: Yes, we had several tips come in.
> PROSECUTOR: And during the course of that, were you able to narrow down the people — of course you had Ms. Schaffner's information. Did that help lead to additional information about possible suspects?
> WITNESS: There was a statement made, and I would have to go back and look[,] but there was a gentleman that was not leaving her alone, just wouldn't let things go and a Freeman, I believe — I think they thought that was the last name actually.

Matthews argues that there was no showing that the unidentified declarants were unavailable for trial and no showing of guarantees

of trustworthiness.

Testimony that the police received "several tips," however, does not alone constitute hearsay, because no statement of any tipster was being offered as proof of a matter asserted by the tipster. See *Newsome v. State*, 288 Ga. 647, 649-650 (2) (706 SE2d 436) (2011) ("Testimony is considered hearsay if the witness is testifying to another party's statement in order to prove or demonstrate the truth of the matter asserted in that statement. See [former] OCGA § 24-3-1."). And, pretermitting whether the statement about Young having difficulties with a man named Freeman, which the declarant thought might be a last name, was hearsay, the statement was cumulative of the testimony at trial of Young's mother. Under these circumstances, we conclude that it is highly probable that admitting the evidence did not contribute to the verdict. See *Clarke v. State*, 308 Ga. 630, 634 (2) (842 SE2d 863) (2020).

*Judgment affirmed. All the Justices concur.*

Decided May 17, 2021.

Murder. Cobb Superior Court. Before Judge Harris.

*Ashleigh B. Merchant*, for appellant.

*Joyette M. Holmes, District Attorney, John R. Edwards, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.