314 Ga. 566
FINAL COPY

S22A0771.  MITCHELL v. THE STATE.

COLVIN, Justice.

Following a jury trial, Kashawn Mitchell was convicted of malice murder and related offenses in connection with the shooting death of Jaron Acklin.[1]  Mitchell claims that the evidence presented at trial was insufficient to support his convictions, that the trial court erred by admitting his custodial statements into evidence, and that the trial court erred during sentencing.  For the reasons that

---

[1] On March 16, 2016, a DeKalb County grand jury jointly indicted Mitchell and Julius Bynum-Horn on charges of malice murder (Count 1), two counts of felony murder predicated on armed robbery and aggravated assault (Counts 2 and 3), one count of armed robbery (Count 4), aggravated assault (Count 5), and possession of a firearm during the commission of a felony (Count 6).  Mitchell was tried alone from April 17 through 20, 2017, and the jury found him guilty of all charges. The trial court sentenced Mitchell to life in prison without parole for malice murder, a consecutive life sentence with the possibility of parole for armed robbery, and five years consecutive for the weapon charge.  The remaining counts were either merged for sentencing purposes or vacated by operation of law.  Mitchell timely filed a motion for new trial, which was amended through new counsel on July 15, 2021.  After a hearing, the trial court denied the motion as amended on December 30, 2021. The appeal was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

follow, we affirm.

1. Mitchell raises two challenges to the evidence supporting his convictions. First, he asserts that the trial court applied the incorrect legal standard by reviewing his claims under OCGA §§ 5-5-20 and 5-5-21 only for legal sufficiency of the evidence. See *Holmes v. State*, 306 Ga. 524, 527-528 (2) (832 SE2d 392) (2019) (holding that, "when the record reflects that the trial court reviewed the motion for new trial [on the general grounds] only for legal sufficiency of the evidence, the trial court has failed to exercise [its] discretion" as the "thirteenth juror" (citation and punctuation omitted)). In its order denying Mitchell's motion for new trial, however, the court noted that it had reviewed "the record, pleadings, and applicable law," and that it had also taken into consideration "the testimony, evidence, exhibits, and arguments of the parties, as well as the demeanor, credibility, and veracity of the witnesses presented at the [motion for new trial] hearing." Accordingly, "[t]he court did not state the incorrect standard in its order, and nothing in the record indicates that the court was unaware of its

responsibility" in reviewing the evidence pursuant to the general grounds. *Hodges v. State*, 309 Ga. 590, 592 (2) (847 SE2d 538) (2020) (citation and punctuation omitted). Therefore, this portion of Mitchell's claim fails.

Mitchell also claims that the evidence presented at trial was insufficient to support his convictions. When evaluating the sufficiency of evidence as a matter of constitutional due process, we must determine whether, viewing the evidence in the light most favorable to the verdicts, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

Viewing the evidence in this light, the record shows that, on

3

the morning of November 16, 2015, a maintenance worker entered Acklin's apartment after one of Acklin's friends voiced concerns that she had not heard from him for two days. Upon entering the residence, the maintenance worker found Acklin dead of a single gunshot wound to the head. When the police responded to the scene, they found Acklin leaning against the wall of his living room with his hands bound behind his back. Detectives noted that there were no signs of forced entry or of a struggle. A spent 9mm cartridge casing was on the living room floor along with empty money clips. Officers learned that a number of items were missing from the apartment, including two hoverboards (one red and one blue) and designer bags.

A forensic examination of Acklin's laptop showed that it was last used on November 13, 2015, around 12:13 p.m. Detectives reviewed surveillance video of the apartment complex from that time, which showed two men entering Acklin's building. Approximately an hour later, the same two men exited the building carrying bags and two hoverboards. The men got into Acklin's car

and drove off.

During their investigation, detectives learned that Acklin ran a large, illegal, check-cashing scheme and, because of this, he was very cautious about whom he allowed into his apartment, almost never permitting strangers or surprise visitors inside. The State presented evidence that Mitchell and Julius Bynum-Horn were friends with Acklin and that they had previously helped him move into his apartment. Phone records showed that the last call Acklin received on November 13 was from a phone used by Mitchell. On that day, that same cell phone had pinged a cell tower near Acklin's apartment.

Surveillance video recovered from a nearby Walmart showed Mitchell and Bynum-Horn riding on hoverboards in the parking lot on the afternoon of November 13, 2015. The men went inside the store, purchased gold spray paint and, according to a witness, used it to change the color of the hoverboards from red and blue to gold. Detectives searched the residence where Mitchell was staying and located bullets that matched the caliber and brand of the spent

5

casing found at the crime scene. They also located a red hoverboard that had been spray-painted gold.

Detectives called Mitchell after they obtained a warrant for his arrest. Mitchell told detectives that he was in New Jersey. However, based upon a previously obtained order, officers were able to track Mitchell's cell phone to his girlfriend's apartment in Stone Mountain. Mitchell was arrested at his girlfriend's residence and, while inside, officers found one of Acklin's missing designer bags.

After his arrest, Mitchell was interviewed by police on two separate occasions — first on December 21, 2015, and again on December 23, 2015. During the first interview, Mitchell admitted that he drove to Acklin's apartment complex on November 13, but denied going inside, claiming he could not get through the front security gate. During the second interview, Mitchell stated the following. He drove Bynum-Horn over to Acklin's apartment so that they could discuss money Acklin owed to Bynum-Horn. While the three men were in the apartment, Acklin and Bynum-Horn got into an argument, which turned so heated that both men pulled guns.

6

They eventually calmed down and put their weapons away, but Bynum-Horn pulled his gun out again during the conversation. Bynum-Horn forced Acklin against the wall, tied him up and held him at gunpoint. During this time, Mitchell took about $2,000 in cash, a hoverboard, and the keys to Acklin's car and then walked outside. Bynum-Horn exited the apartment shortly after with another hoverboard, a designer backpack, and clothing. Mitchell and Bynum-Horn then left in Acklin's car and abandoned it at another apartment complex located nearby. Mitchell denied shooting Acklin.

Mitchell alleges that the evidence was insufficient to support his convictions because there was no physical evidence connecting him to the scene of the crime. Viewing all of the evidence presented at trial in the light most favorable to the verdicts, however, it was sufficient as a matter of constitutional due process to authorize a rational jury to find Mitchell guilty beyond a reasonable doubt of the crimes charged. See OCGA §§ 16-2-20 (defining "party to a crime"); 16-5-1 (a) (defining "malice murder"); 16-8-41 (a) (defining "armed

robbery"); 16-11-106 (b) (defining "possession of a firearm during the commission of a felony"). See also *Johnson v. State*, 296 Ga. 504, 505 (1) (769 SE2d 87) (2015) (explaining that "the State was not required to produce any physical evidence, as the testimony of a single witness is generally sufficient to establish a fact, and the lack of corroboration with physical evidence only goes to the weight of the evidence and the credibility of the testifying witness, which is solely within the purview of the jury" (citation and punctuation omitted)).

2. Mitchell claims that the trial court erred by failing to grant in full the motion to suppress his December 21 and December 23 custodial statements. First, Mitchell contends that his statements were obtained in violation of OCGA § 24-8-824,[2] alleging that his December 21 statement was induced by the "remotest fear of injury" because officers threatened him with physical violence, and that his December 23 statement was induced by "the slightest hope of benefit" because he was promised a lesser charge in exchange for a

_____

[2] "To make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."

statement. Second, he claims that his statements were not made freely and voluntarily as a matter of constitutional due process. We see no reversible error.

As an initial matter, there are questions as to whether Mitchell's fear of injury and constitutional due process claims are preserved for ordinary appellate review rather than plain error. However, we need not decide the preservation issues in this case because, as discussed below, these claims fail even if we apply ordinary appellate review. See *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (when reviewing for plain error, a defendant must show, among other things, that the legal error was "clear or obvious, rather than subject to reasonable dispute") (citation and punctuation omitted). See also *Dolphy v. State*, 288 Ga. 705, 710 (3) (707 SE2d 56) (2011) (explaining that, where there is no reversible error, "it follows that there could be no plain error either since plain error does not exist in the absence of reversible error" (citation and punctuation omitted)).

9

Turning to Mitchell's claims, at a pre-trial *Jackson-Denno*[3] hearing, Detectives Stallings and Yeargin testified that, at the December 21 interview, Mitchell was not under the influence of any drugs or alcohol and did not appear to suffer from any mental illness. Prior to beginning the interview, detectives informed Mitchell that they needed to read him his rights, to which Mitchell responded, "Yeah, like right to remain silent." The detectives read Mitchell his *Miranda*[4] rights, which he agreed to waive by signing a waiver form. The detectives testified that Mitchell never requested an attorney, that he never asked to stop the interview, and that they did not threaten Mitchell or promise him anything in exchange for his statements.

Mitchell's December 21 interview was audio-recorded and played for the trial court. During this interview, Mitchell told officers that he drove to Acklin's apartment the night of November 13, but denied ever driving inside the apartment complex.

---

[3] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).
[4] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Throughout the interview, Mitchell denied killing Acklin, noting that they were friends. One of the detectives explained that being friends with a person does not stop murders from occurring. He then said to Mitchell, "I mean, we, — we could sit here and talk like this or we can have Freaky[5] chase you down, beat you up in an apartment, and put a gun in your mouth." Mitchell responded, "Freaky ain't gonna do no s\*\*t like that. I'm talking to this man. This man ain't gonna do no s\*\*t like that." Mitchell continued to deny being present at Acklin's apartment on the day of his death.

Mitchell was interviewed a second time on December 23. This interview was also recorded. Mitchell was read his *Miranda* rights and, once again, acknowledged that he understood his rights, agreed to speak with officers, and signed the waiver form. The detectives later testified at the motion for new trial hearing that, during this interview, Mitchell was not threatened in any way and he was not promised anything in exchange for his statement.

During this interview, Mitchell asked to speak with someone

---

[5] "Freaky" was friends with Acklin and Mitchell.

from the District Attorney's office, asking why he should talk to officers when he was not getting a deal in return. The detectives called Assistant District Attorney Steven Ruth from the interview room and stated that Mitchell "wants to know from you guys, if the information that he provides does pan out, as far as, like, our second suspect in this murder case, is his murder charge going to be reduced to something else." Ruth informed Mitchell that, "if you're looking for a deal based upon information that you might be able to bring forward, all I can tell you is, 'no sir,' there is no deal on the table." Mitchell continued to press for a deal, at one point stating:

> [H]ow can I give you guys everything that y'all want to hear, like, y'all all sittin' here stressin' "who else is on the video[?]" I know exactly who them two people is on that video. I know who else was there. Right, so. Y'all sittin' here base, basing your investigation on this when it's way more to the fact, but, my whole thing is, how can I give y'all any information when y'all, the only thing y'all can do is tell me, "hey, we don't know, we don't know what's going to happen once you tell us what we want to hear. We can't, we can't promise you anything. We're not, we're not telling you that we're going to do anything."

Mitchell continued his attempts to negotiate for a deal, and, eventually, Detective Yeargin stated as follows:

12

I know what you're asking is, you want a guarantee that you're not going to be charged with murder. Well, here's the thing, Shawn: right now, because Mr. Ruth has not seen the case and because this is so fresh, because we just arrested you the other night, alright? So, the issue is, because they don't have everything to make the charges change, what we're doing is getting something from you to validate. That way, when it comes time to go to the Grand Jury, which is, you know, which could be soon, that you'll be charged appropriately, instead of with murder. Okay? And I'm telling you, from my point of view, I'm the one in charge of this case, I will put it in front of the District Attorney and say, "hey, this is what he told us, this is what we validated, this is what the truth is, he's not the shooter." Okay? That's where we could go and that's all I can tell you right now.

Mitchell asked, "[i]f I give you the truth, you're going to speak on my behalf and let them know, this is what we feel . . . ," after which the detectives reminded Mitchell that the conversation was being recorded and the prosecutor was listening and taking notes. Mitchell responded "[a]lright. F**k it," and gave a statement admitting that he and Bynum-Horn robbed Acklin. The prosecutor left the call, but the detectives continued speaking with Mitchell. And the following exchange occurred:

> YEARGIN: Without him on the phone, I'm going to tell you, I'm still recording, and I'm going to tell you, man to

13

man. Okay? I will take what I've got right here, we're going to vet this information to make sure it's accurate and I promise you, if it is, I will talk to the D.A., and we will charge you appropriately. Okay? You will get charged with something, but it won't be murder, in the event that this all pans out. Okay?

STALLINGS: It may be robbery, home invasion, something like that, but it ain't going to be murder.

MITCHELL: But it wasn't home invasion, because we didn't —

STALLINGS: You get what I'm saying, though? It may be something —

YEARGIN: Something different.

STALLINGS: It's not going to be murder, though, it doesn't sound like. Man. Good luck to you, okay? And we got you. It's not over. Alright.

MITCHELL: My whole thing is, when y'all go to Jay, he going to shoot.

STALLINGS: Oh, we already told them.

MITCHELL: And y'all going to shoot. And if y'all kill him, that's a wrap for me.

YEARGIN: No it's not.

STALLINGS: That's not true.

YEARGIN: Not true at all.

STALLINGS: Because you just told us things that we have told nobody, outside of detectives, so.

YEARGIN: And I'm going to tell you right now, you, providing that information that keeps me safe, knowing what I need to do in order to go into that apartment, or that house, that's going to help you out, man. We're not going to forget. Alright? Let's get you out of here, man.

The interview ended, and Mitchell made no additional incriminating statements.

14

The trial court denied Mitchell's motion to suppress in part, finding that the "statements made by [Mitchell] to members of law enforcement on December 21, 2015 . . . were freely and voluntarily given." The court also denied the motion "as to the statements made by [Mitchell] to members of law enforcement on December 23, 2015, up until the point where Assistant District Attorney H. Steven Ruth, who was present during the statement by telephone, hangs up the telephone and terminates the call," concluding that those statements "have been freely and voluntarily given." But the trial court also granted the motion in part, suppressing the portion of Mitchell's interview that occurred after Ruth left the call, finding that "portion not to have been freely and voluntarily given." Later, after the hearing on Mitchell's motion for new trial, the court further addressed the custodial statements, finding "that Mitchell's properly admitted *Mirandized* statements were not induced by any hope of benefit. This is especially true because ADA Steve Ruth abundantly made it clear to Mitchell in no uncertain terms that there was no deal on the table." The motion for new trial court also

15

found that Mitchell's statements were not induced by threats or fear of injury because, "when taken in context, no person in Mitchell's position would have believed that the interviewing detective was making a credible death threat. The detective's tone and Mitchell's tone combined with his words belie his claims in [that] regard."

(a) *Fear of Injury*

Mitchell claims that his December 21 statement was induced by fear of injury as a result of a "credible death threat" stemming from the detective's statements about "Freaky" chasing Mitchell and beating him up and "put[ting] a gun in [his] mouth." When reviewing a statutory claim of involuntariness,

> the reviewing court accepts the trial court's determinations as to the credibility and weight of conflicting evidence unless they are clearly erroneous and independently reviews the trial court's application of the law to the facts. De novo review is appropriate, however, if the controlling facts can be definitively ascertained, exclusively by reference to evidence, such as a recording of a police interview, that is uncontradicted and presents no questions of credibility.

*Matthews v. State*, 311 Ga. 531, 542 (3) (b) (858 SE2d 718) (2021) (citation omitted). "Physical or mental torture is the type of fear of

injury that prevents a confession from being admissible" under OCGA § 24-8-824. *Browner v. State*, 296 Ga. 138, 142 (2) (765 SE2d 348) (2014).

Here, the trial court found that "no person in Mitchell's position would have believed that the interviewing detective was making a credible death threat." The record supports this conclusion. Mitchell did not testify at the hearing on the motion to suppress, and the officers testified that they did not threaten Mitchell in order to obtain a statement. Reviewing the exchange as a whole, the record shows that the detective was responding to Mitchell's remarks that he would not have killed Acklin because they were friends. Further, Mitchell's "statements [and] demeanor, . . . in the recording of the interview support the conclusion that [the defendant] was not induced by any brutality or deprivation before or during the interview or by any perceived threat of future injury." *Matthews*, 311 Ga. at 544 (3) (b). See also *Gober v. State*, 264 Ga. 226, 228 (2) (443 SE2d 616) (1994) (explaining that the challenged statement did not violate the former version of OCGA § 24-8-824

because the statement "was not otherwise reasonably likely to induce a fear of injury if [the defendant] invoked his right to counsel"). Consequently, this claim fails.

(b) *Hope of Benefit*

Mitchell further claims that his December 23 statement was induced by an improper hope of benefit, arguing that detectives repeatedly emphasized that Mitchell would "be charged appropriately, instead of with murder," if he gave a statement. As this Court has previously explained, the "slightest hope of benefit refers to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Budhani v. State*, 306 Ga. 315, 325 (2) (b) (830 SE2d 195) (2019) (citation and punctuation omitted). However, the record shows that Mitchell was not promised a reduction in charges prior to making any incriminating statements. Indeed, Mitchell attempted numerous times to negotiate with the police and the prosecutor for a reduction in his murder charge. The prosecutor, however, consistently refused to engage in such negotiations, clearly telling Mitchell that there

18

was "no deal on the table."

Likewise, the detectives did not promise Mitchell that they would reduce his charges or that he would receive a shorter sentence prior to him making any incriminating statements. Rather, "[t]he detectives merely acknowledged that [Mitchell] wanted a deal, that he perhaps could get some arrangement, and that they would talk with the district attorney, but it was clear to [Mitchell] that any agreement would require the assent of the district attorney." *Shepard v. State*, 300 Ga. 167, 170 (2) (794 SE2d 121) (2016) (emphasis omitted). Moreover, the detectives repeatedly stated that any reduction in charges would be contingent on their ability to "validate [Mitchell's] story." This Court has previously held that an officer's statement urging a defendant to offer information that may mitigate or justify his role in the crimes does not qualify as an improper hope of benefit. See, e.g., *Dawson v. State*, 308 Ga. 613, 621-622 (3) (842 SE2d 875) (2020); *Johnson v. State*, 295 Ga. 421, 425 (2) (761 SE2d 13) (2014) (no improper hope of benefit where detective did not "indicate that a confession would result in lesser

19

charges [but rather] merely suggested that [the defendant] would be well served by offering his version of events as a means of justifying or mitigating his role in the [crimes]"). Accordingly, we conclude that the trial court did not err in denying Mitchell's motion to suppress on this ground.

(c) *Voluntariness under Constitutional Due Process*

Finally, Mitchell alleges that the State failed to meet its burden of proof that his statements were voluntary under the totality of the circumstances. When a defendant challenges the voluntariness of his statement as a matter of constitutional due process, a trial court must consider the totality of the circumstances, with the burden of proof falling on the State to demonstrate the voluntariness of the statements by a preponderance of the evidence. See *Welbon v. State,* 301 Ga. 106, 109 (2) (799 SE2d 793) (2017).

Here, the record supports the trial court's determination that, under the totality of the circumstances, Mitchell's December 21 and December 23 statements were made voluntarily as a matter of constitutional due process. The record shows that, prior to both

interviews, Mitchell was informed of his *Miranda* rights. After receiving the verbal and written warnings, Mitchell indicated that he understood his rights and agreed to speak with officers without an attorney present. He never asked to stop the interview and, as discussed above, in the portion of the interview that was not suppressed, Mitchell was not promised any leniency in charges or sentencing or coerced into making his statements.[6] Indeed, "[t]here is no evidence of excessively lengthy interrogation, physical deprivation, brutality, or other such hallmarks of coercive police activity" during either of Mitchell's custodial interviews. *Drake v. State*, 296 Ga. 286, 291 (3) (766 SE2d 447) (2014) (citation and punctuation omitted). Accordingly, the trial court did not err by admitting these statements at trial.

---

[6] Although Mitchell argues that there was a "theme" throughout both interviews that officers were holding out a hope of "gain," he has not identified any specific evidence of an offer of a lesser sentence in any portion of the interviews that was not suppressed. Further, the hope of benefit offered in the suppressed portion of the December 23 interview had no causal relationship to the earlier statements admitted as voluntary. See *Pulley v. State*, 291 Ga. 330, 333 (2) (729 SE2d 338) (2012) (holding that law enforcement promises alone are insufficient to render a confession inadmissible and that "[t]here must also be a *causal connection* between the police conduct and the confession" (citation and punctuation omitted; emphasis in original)).

21

3. Mitchell contends that the trial court erred in sentencing him to life without the possibility of parole without first considering any mitigating or aggravating circumstances that would be taken into account in a death penalty case. See OCGA § 17-10-30 (b). However, we have rejected the contention that a trial court cannot sentence a convicted murderer "to life without the possibility of parole without first considering any mitigating or aggravating circumstances that would be taken into account in a death penalty case." *Parks v. State*, 305 Ga. 712, 713 (2) (827 SE2d 669) (2019). As we have explained, a trial court sentencing a defendant for a murder committed after April 29, 2009, may impose a sentence of life without the possibility of parole even if the State did not seek the death penalty in his case, and the court is "not required to recite that it considered aggravating or mitigating circumstances in doing so." Id. at 714 (2). See also *Williams v. State*, 291 Ga. 19, 21 (1) (727 SE2d 95) (2012) (noting that a trial court need not consider mitigating factors when sentencing a murder defendant to life without the possibility of parole), disapproved of on other grounds

by *Kimbrough v. State*, 300 Ga. 516, 520 (3) n.6 (796 SE2d 694) (2017).

Mitchell argues that we should overrule *Parks* and *Williams* based on "evolving standards of decency" stemming from the United States Supreme Court's decision in *Miller v. Alabama*, 567 U. S. 460 (132 SCt 2455, 183 LE2d 407) (2012), which held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." Id. at 470 (II). Mitchell's reliance on *Miller*, however, is misplaced, as Georgia law did not mandate that Mitchell receive a life-without-parole sentence for his murder conviction. See OCGA § 16-5-1 (e) (1) (listing the available sentences for a person convicted of murder as "death, . . . imprisonment for life without parole, or by imprisonment for life"). Moreover, Mitchell was not a juvenile when he committed the crimes. Accordingly, this claim fails.

*Judgment affirmed. All the Justices concur.*

Decided September 7, 2022.

Murder. DeKalb Superior Court. Before Judge Adams.

*Davis Hewitt Law Firm, William D. Hewitt*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Buffy D. Thomas, Lenny I. Krick, Destiny H. Bryant, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.