NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 28, 2025

S25A0048. SHORT v. THE STATE.

LaGrua, Justice.

In November 2019, Appellant Angelo Short was convicted of malice murder and related crimes arising from the stabbing death of Peggy Gamble, along with other crimes committed within 48 hours of Gamble's death.[1] On appeal, Short challenges the trial

---

[1] The crimes occurred in Muscogee County on November 27-29, 2016. A Muscogee County grand jury returned an indictment on October 16, 2018, charging Short with malice murder, felony murder, and aggravated assault for Gamble's killing (Counts 1, 2, and 3, respectively), burglary in the first degree and theft by taking for Short's entry into Gamble's home and taking of items after the killing (Counts 4 and 5, respectively), robbery of a Piggly Wiggly after the killing (Count 6), and obstruction of an officer arising from Short's arrest on November 29, 2016 (Count 7). Short was tried November 4-8, 2019, and the jury returned guilty verdicts on all counts. On November 19, 2019, Short was sentenced to life in prison without parole plus 40 years in total, delineated as follows: life without parole for Count 1 (malice murder), with which Count 2 (felony murder) and Count 3 (aggravated assault) were merged; 20 years consecutive for Count 4 (burglary in the first degree); 20 years consecutive for Count 6 (robbery); and 12 months concurrent with Count 1 for the misdemeanors in Count 5 (theft by taking) and Count 7 (obstruction of an officer). We note that the trial court erred at sentencing by merging Counts 2

court's admission of incriminating statements that he gave to officers with the Columbus Police Department ("CPD") during custodial interviews conducted by Detective Stuart Carter and Sergeant Lance Deaton.[2] Specifically, Short argues that the trial court erred in ruling that his statements, which amount to a confession, were not induced by the slightest hope of benefit or remotest fear of injury. OCGA § 24-8-824.[3] We disagree and affirm.

---

and 3 into Count 1, rather than vacating Counts 2 and 3 by operation of law. See *Hulett v. State*, 296 Ga. 49, 53 (2) (766 SE2d 1) (2014) ("[W]hen a valid guilty verdict is returned on both malice murder and felony murder of the same victim, the defendant should be sentenced for the malice murder, and the alternative felony murder count stands vacated by operation of law as simply surplusage.") (cleaned up). However, this error in nomenclature does not affect Short's sentence and is otherwise harmless. *Manner v. State*, 302 Ga. 877, 890-891 (IV) (808 SE2d 681) (2017).

[2] Audio and video recorded interviews were conducted on November 29, 2016 (the "November 29 interview"), December 5, 2016 (the "December 5 interview"), December 14, 2016, and February 1, 2017. Short's confession was obtained during the December 5 interview.

Short timely filed a motion for new trial on November 19, 2019, which was twice amended. Following briefing and an evidentiary hearing, the trial court denied Short's amended motion for new trial by order dated December 30, 2022. Short timely filed a notice of appeal on January 24, 2023. His appeal was docketed to the term of this Court beginning in December 2024 and submitted for decision on the briefs.

[3] Under Georgia statutory law, "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. Short challenges the admission of his confession only as a matter of statutory law and raises no constitutional due process argument.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that 83-year-old Gamble was stabbed to death in her home in Columbus during the overnight hours of November 27-28, 2016.[4] CPD officers discovered Gamble's body around noon on November 28, 2016, observed signs of forced entry at her home, and learned that several items were missing, including Gamble's gold 1988 Toyota Corolla. Seeking leads and the public's assistance to locate Gamble's car, CPD issued a BOLO[5] for the Corolla and a press release to the media. Late in the evening on November 28, 2016, CPD officers received a tip connecting Short to Gamble's car.[6] Officers responded to the tipster's location and

---

[4] A medical examiner testified that Gamble's death was a homicide caused by 13 stab and sharp force injuries at various lengths and depths. The murder weapons – two kitchen knives taken from Gamble's home – were recovered by CPD officers during the investigation of the crimes, and a forensic scientist who examined the knives testified that blood on one of them partially matched Gamble's DNA.

[5] BOLO stands for "[b]e on the lookout [for]." See BOLO, Black's Law Dictionary (12th ed. 2024) ("Police sometimes use this expression for people or vehicles that they are trying to locate.").

[6] Specifically, Angela Champion was at her home in Columbus when Short, an attendee of Champion's Thanksgiving get-together earlier in the week, pulled up in Gamble's car. Champion recognized the car from the news and called the police, but Short had left the scene on foot by the time officers arrived.

discovered Gamble's car, but Short was nowhere to be found.[7]

By daybreak on November 29, 2016, Short was a suspect in Gamble's killing, and CPD officers spent the day on the lookout for him. Short robbed a Piggly Wiggly that morning, but CPD officers were unable to locate him until around 6:00 p.m., in response to a series of calls regarding Short's location. CPD officers converged on that area, and Short barricaded himself inside a vacant apartment before being subdued and arrested. Short was then taken to CPD headquarters, where the first custodial interview occurred.

Detective Carter and Sergeant Deaton first interviewed Short in the hours immediately after his arrest on November 29, 2016. During this interview, Short confessed to the Piggly Wiggly robbery after being advised of his *Miranda*[8] rights and waiving the same.[9] Short admitted during this interview that he knew Gamble and that

---

[7] Several other witnesses testified to seeing Short in or with Gamble's car on November 28, 2016 at various locations in Columbus. Some of them, including Taquawn Pollard and Madison Reese, even rode in the car with Short on this date as he and others attempted to sell Gamble's car for drug money, committed thefts, and bought and used crack-cocaine.

[8] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[9] Short also signed an advice and waiver of rights form during the November 29 interview.

4

he recognized her car, but Short did not admit or deny his involvement in Gamble's killing or the theft of her car. Throughout this interview, the officers encouraged Short to tell the truth and suggested that they already knew Short killed Gamble and stole her car. The officers also suggested at various points that telling the truth would be helpful to Short when it came to a potential plea deal or sentencing recommendation. Of note, the officers pointed out that "there is a difference between life in prison with no parole or if you plead out to a sentence[,]" opined that the district attorney's office "might" offer Short a plea deal, suggested that "if" the district attorney offered a plea deal, "it could be 25 years," and told Short that "anything [the district attorney's office] could offer [him] is a lot shorter than life without parole." The officers also told Short that they would "have an input" when it came time for the district attorney to make a sentencing recommendation to the court. At the end of the interview, Short was photographed, his clothing was collected by the officers, and he was taken to the county jail.

A week later, on December 5, 2016, Detective Carter

5

transported Short from the county jail to CPD headquarters for a second interview. At the start of this interview, Short told Detective Carter and Sergeant Deaton that he wanted to talk with them about his "housing situation," and said that he tried to contact them from the county jail but was unable to do so since he had been in solitary confinement since his first day there. In so doing, Short recalled telling someone that he did not feel safe in the county jail. Short thought this person might have been Detective Carter, but Detective Carter responded, "[t]hat must have been over at the jail if they asked you if you felt safe." Detective Carter and Sergeant Deaton then proceeded to update Short on their investigation and told Short that he was going to be charged with Gamble's murder. They also told Short that blood was found on the clothing collected from him during the previous interview and informed Short that they were expediting forensic testing on that blood. Detective Carter said "this is a case that could get a death penalty case" in light of "the victim and the circumstances that are involved[,]" and suggested that, if "one drop" of Gamble's blood was found on Short's clothing, such a

6

discovery would "smoke" him since it "would not leave any doubt." Detective Carter also opined that, "[i]f there's physical evidence to support what we got, then they could go for a death penalty case if they elected to do that. I'm not saying they are going to. I'm just saying it's a possibility." A few minutes later, Detective Carter theorized how he thought Short was "at the end of his rope[.]"Short agreed that "this will probably be it" for him, to which Detective Carter responded:

> I'm not sure what you mean by that. I can tell you this: if you take this to a jury trial, and our evidence comes back the way we anticipate it to come back and -- if the DA's office, knowing they are going to a jury trial, they push for the death penalty, you're right, it is the end for you. OK?

Short then told the officers that he wanted to talk to his mother, and arrangements were made for Short's mother to bring him lunch to CPD headquarters later that day.

Before his mother arrived, Short told the officers he was ready to "tell the story now." At this point, the officers advised Short of his

*Miranda* rights for a second time, and Short again waived them.[10] Short proceeded to tell the officers that he went to Gamble's home on November 28 so that he "could get a couple of dollars or something like that[,]" that Gamble gave Short her car with permission and an instruction to fill it up with gas for her, but that Short "stayed gone with the car" instead. Short said that he ran into Pollard shortly thereafter, and that Pollard suggested the two men return to Gamble's home, which they did. Short told the officers that, when they arrived at Gamble's home, Pollard went inside and killed Gamble while Short stayed in the car. The officers told Short they did not believe his story and implored him to "get it all out" and "be honest." Detective Carter said, "[i]f you lie to me, I can't go to the DA's office and give you a good recommendation[,]" and told Short the "worst thing" he could do for himself was lie.

When Short's mother arrived, the two ate lunch in the interview room for approximately 90 minutes without the officers

---

[10] A second advice and waiver of rights form was signed prior to Short's confession during the December 5 interview.

present. The camera in the interview room continued to record. Short did not confess to committing the crimes to his mother, but they discussed the fact that Short was in solitary confinement because he was having "conflict" with other inmates. Short's mother expressed concern for her son's safety, but Short assured her that she did not need to worry. During their conversation, Short mentioned that he requested to be placed in a protective custody cell where he would "have no trouble" with other inmates, but did not specify who he talked to and said he did not know "how that works out." Near the end of their lunch, Short's mother told him to "do what's right."

When Short's mother left, Detective Carter and Sergeant Deaton resumed their interview, and Short confessed that he "did everything." Specifically, Short reiterated that he went to Gamble's home to ask for money, but now said that Gamble turned him away, so Short kicked in her door, went inside, took money from Gamble's purse, two TVs, and Gamble's car. Short said that Gamble promised not to tell anyone about the incident, but he did not believe her, so

he "grabbed a knife" from her kitchen and "stabbed her." Short later clarified that he used two knives from Gamble's kitchen in the killing and said that he could take the officers to where he disposed of them.

After Short confessed, he asked the officers to "help [him] try to get the best deal [he] can in this situation." Detective Carter responded that, "once [his case] turns over to the DA's office, they're in full control[,]" but added that he would "sit down" with the district attorney's office on Short's behalf. Detective Carter also told Short that, "in a confession-type thing, that normally kind of takes the death penalty kind of off the table." At the conclusion of the interview, Short directed CPD officers to the murder weapons, which were recovered and later admitted at trial. Detective Carter testified at trial that he took Short back to the county jail afterward, where he spoke with a jail employee "in [Short's] presence" about Short "having issues" with other inmates and Short's request to be placed in protective custody.

A pre-trial *Jackson-Denno*[11] hearing was held regarding the admissibility of Short's confession. After receiving testimony from Detective Carter and admitting the recorded interviews and advice and waiver of rights forms into evidence, Short's counsel said his client would not be testifying and argued that Short's confession should be excluded from trial because it was induced in violation of OCGA § 24-8-824 based on the "[t]otality of the circumstances, hope or benefit, promise, threats of harm, any number of issues." Counsel for the State argued in rebuttal that Short "was not promised anything" and that no "hope of benefit was held out." After arguments, the trial court said the hearing was "done" and went off the record. However, the trial court went back on the record minutes later because Short was "adamant" about testifying.

Short then testified that, after the November 29 interview, he was placed in general population at the county jail, where he was "being threatened" by other inmates. Short said he was "in fear for [his] life" at that time and reported his concerns to jail employees.

---

[11] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

One of those employees, according to Short, gave him the option of staying in general population or going to solitary confinement. Short said that he chose the latter and that he remained in solitary confinement until Detective Carter transported him to CPD on December 5. Short also said that, after being interviewed on December 5, he was returned to solitary confinement and remained there "until another interview[.]"Short testified that he "made [Detective Carter] aware of what was going on at the jail" – specifically, that he was concerned for his safety, had been placed in solitary confinement, and wanted to be moved to protective custody. Short said he made these facts known to Detective Carter "in the car," that Detective Carter responded by saying that "he would see . . . what he could do for me depending on how I cooperated with him[,]" that Detective Carter promised Short "protective custody for [his] cooperation[,]" and affirmed that he confessed "based on those promises" by Detective Carter.[12]

---

[12] Short did not clarify when he talked with Detective Carter "in the car," and Detective Carter was not recalled at the *Jackson-Denno* hearing to testify

After the *Jackson-Denno* hearing, the trial court preliminarily ruled that Short's confession was admissible and formalized that preliminary ruling at the start of trial. Short objected to the ruling, and "reserve[d] the right to ask for those specific instructions during the jury charge."[13] Key portions of the recorded interviews, including Short's confession, were admitted into evidence during the State's case-in-chief and played for the jury. At the conclusion of the trial, the jury returned guilty verdicts on all counts, and a sentence was imposed by the trial court.

Short timely moved for a new trial, arguing in relevant part that "[t]he trial court erred by allowing defendant's pre-trial statements to be introduced into evidence." At a motion for new trial hearing, Short argued his confession was "induced by a hope of benefit" because the officers allowed Short to have lunch with his

in response to Short's contentions. The record reflects that the hearing ended abruptly when Short collapsed on the stand and required medical intervention. Afterward, the trial court gave both parties an opportunity to add to the record, but no further arguments were made.

[13] Short raised no objection to the proposed jury instructions at the charge conference, and the jury was ultimately instructed that, "[a] statement induced by the slightest hope of benefit or remotest fear of injury is not voluntary."

mother during the December 5 interview and because of "the threats that were involved" in procuring it – namely, the officers' "death penalty talk[,]" as well as threats from other inmates, which ultimately resulted in Short being placed in protective custody. In a post-hearing brief, Short maintained that the trial court "should have suppressed Short's statement because of the hopes of benefit, and actual benefits, and fears of injury offered and afforded prior to his confession." Short's motion for new trial was denied by order dated December 30, 2022. This appeal followed.

1. Short argues that his confession was induced by both the "slightest hope of benefit" and the "remotest fear of injury," such that the trial court erred by admitting his confession at trial. OCGA § 24-8-824. We disagree.

Under Georgia law, "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. We have held that the "slightest hope of benefit" referred to by the statute "is not to be understood in the colloquial sense, and

that the phrase refers to promises related to reduced criminal punishment – a shorter sentence, lesser charges, or no charges at all." *State v. Leverette*, 320 Ga. 806, 809 (2) (912 SE2d 533) (2025) (cleaned up). The phrase "remotest fear of injury," in turn, refers to "physical or mental torture or coercion by threats." *State v. Lynch*, 286 Ga. 98, 100 (1) (686 SE2d 244) (2009) (citations and internal quotations omitted) (decided under former code). When a defendant argues that a custodial statement made to law enforcement was involuntary under OCGA § 24-8-824 and seeks exclusion of that statement before trial, the State bears the burden of establishing the admissibility of the statement by a preponderance of the evidence. *Henderson v. State*, 310 Ga. 708, 710 (2) (854 SE2d 523) (2021) (citation omitted). In evaluating such arguments, the trial court "must consider the totality of the circumstances in determining whether the defendant's statement is admissible under OCGA § 24-8-824." *Leverette*, 320 Ga. at 809 (2) (citing *Henderson*, 310 Ga. at 710 (2)). See also *Leverette*, 320 Ga. at 821 n.15 (Peterson, P.J., dissenting) (discussing applicable standard of review). Whether

15

a statement offers a hope of benefit or threatens harm "is not itself sufficient to render a defendant's later statements to law enforcement inadmissible[.]" See *Budhani v. State*, 306 Ga. 315, 325 (2) (b) (830 SE2d 195) (2019) (explaining that a violation of OCGA § 24-8-824 requires officers to have "actually induced the defendant's statements") (cleaned up); *Pulley v. State*, 291 Ga. 330, 332 (2) (729 SE2d 338) (2021) (observing "the key inquiry is whether the alleged promise actually induced the statement that Appellant seeks to suppress") (cleaned up). We review the trial court's admissibility decision de novo where "the controlling facts can be definitively ascertained, exclusively by reference to evidence, such as a recording of a police interview, that is uncontradicted and presents no questions of credibility." *Leverette*, 320 Ga. at 809-810 (2) (citations omitted). Otherwise, "the reviewing court accepts the trial court's determinations as to the credibility and weight of conflicting evidence unless they are clearly erroneous and independently reviews the trial court's application of the law to the facts." *Matthews v. State,* 311 Ga. 531, 542 (3) (b) (858 SE2d 718) (2021)

16

(citation omitted).

Here, the trial court ruled that Short's post-*Miranda* confession was admissible because Short "knowingly was informed of his rights" and "waived those rights . . . repeatedly" and allowed Short's confession to be admitted into evidence at trial over Short's objection. These rulings expressly rejected Short's argument that his confession was induced in violation of OCGA § 24-8-824 based on the "[t]otality of the circumstances, hope or benefit, promise, threats of harm, any number of issues." Thus, while the trial court's rulings did not reference any "hope of benefit," "fear of injury," or OCGA § 24-8-824 itself, the express rejection of Short's contrary position and decision to admit Short's confession at trial is, by necessary implication, a ruling that Short's confession was obtained consistent with the dictates of OCGA § 24-8-824 and not induced by an impermissible hope of benefit or fear of injury.

Short advances two arguments on appeal as to why his confession was inadmissible at trial: one is based on an alleged "hope of benefit" and the second is based on an alleged "fear of injury." We

address them in turn.

(a) Short maintains that his confession was induced by the slightest hope of benefit when officers "repeatedly reiterated that a confession and guilty plea would allow him to obtain a 25-year sentence and avoid imprisonment for life without the possibility of parole or the death penalty." This contention fails because, when viewed in context, none of the statements made by officers relating to a plea deal or possible sentence amounted to "promises related to reduced criminal punishment." *Leverette*, 320 Ga. at 809 (2) (citation omitted). See *Henderson*, 310 Ga. at 712 (2) (explaining that "exhortations or encouragement to tell the truth, conveying the seriousness of the accused's situation, or offering to inform the district attorney about the accused's cooperation while making clear that only the district attorney can determine charges and plea deals – do not amount to a hope of benefit") (citation omitted).

Throughout the recorded interviews, the officers suggested that telling the truth or giving a confession might be helpful to Short or play a beneficial role in plea negotiations or when it came to a

18

potential future sentence. However, the officers did not promise Short that a plea offer would be made to him or tie a promise of a plea offer to any particular sentence or punishment. While the officers pointed out that there could be a "difference" in his punishment depending on "if [he] pled out to a sentence," they made clear that it was the district attorney's office, rather than themselves, who "might" offer him a plea. Insofar as a particular punishment or sentence is concerned, the officers stated that "if" the district attorney offered Short a plea, "it could be 25 years," and simply pointed out a fact when observing that "anything they could offer you is a lot shorter than life without parole." Moreover, while the officers told Short they would "have an input" with the district attorney and said they would make a "good recommendation" on Short's behalf if he told the truth, the officers made clear that the district attorney, rather than themselves, would have the final word on any plea deal or sentencing recommendation. These noncommittal statements by the officers did not amount to "promises related to reduced criminal punishment." *Leverette*, 320

19

Ga. at 809 (2) (citation omitted). See *Perez v. State*, 309 Ga. 687, 693-694 (2) (848 SE2d 395) (2020) (concluding that officers' statements to a defendant "that he could help himself by being honest and by telling [the officers] what really happened" was "not the equivalent of offering a hope of benefit"); *Samuels v. State*, 288 Ga. 48, 50 (1) (701 SE2d 172) (2010) ("Sheriff Marshall's suggestion that he may at some point be willing to talk to the district attorney did not constitute a reward of a lighter sentence[.]") (citation omitted); *Taylor v. State*, 274 Ga. 269, 273 (2) (553 SE2d 598) (2001) ("It also does not render a statement involuntary for the police to tell a suspect that the trial judge may consider her truthful cooperation with the police."), disapproved on other grounds, *State v. Chulpayev*, 296 Ga. 764, 783 (3) (b) (770 SE2d 808) (2015); *Arline v. State*, 264 Ga. 843, 844 (2) (452 SE2d 115) (1995) ("Merely telling a defendant that his or her cooperation will be made known to the prosecution does not constitute a 'hope of benefit' sufficient to render a statement inadmissible[.]") (citation omitted).

The same is true to the extent that Short argues the officers

induced his confession with an improper hope of benefit by referring to his case as a "death penalty case," by insinuating that discovery of Gamble's blood on Short's clothing would "smoke" him, and by suggesting – after Short had confessed – that his confession "normally kind of takes the death penalty kind of off the table." With respect to these statements, "context matters." *Leverette*, 320 Ga. at 811 (2) (citation omitted). These first two statements were made in the context of Detective Carter discussing the "possibility" that the district attorney's office "could go for a death penalty case . . . if they elected to do that." And Detective Carter immediately followed up on that statement by clarifying: "I'm not saying they are going to [pursue the death penalty], I'm just saying it's a possibility because this woman is 83 years old, OK?" In context, these statements are no more than "simply an explanation of the seriousness of his situation" as a suspect accused of murdering an 83-year-old woman and do not otherwise render his confession inadmissible. See *Sosniak v. State*, 287 Ga. 279, 288-289 (1) (C) (695 SE2d 604) (2010) (concluding that officer's suggestion that defendant was "already

21

looking at a death penalty case" and "could 'get the needle'" amounted to no more than an explanation of the seriousness of the defendant's situation) (citation omitted).

Finally, the statement made by Detective Carter that Short's confession "normally kind of takes the death penalty kind of off the table" is not only equivocal, but came after Short's confession had been obtained, and "any hope of benefit given by the police to a defendant after the defendant has already confessed cannot be said to have induced the confession and thus does not affect its voluntary nature." *Chandler v. State*, 262 Ga. App. 639, 640 (1) (583 SE2d 494) (2003). See *Budhani*, 306 Ga. at 325 (2) (b) (noting requirement of actual inducement).

For the reasons stated above, Short's hope of benefit argument fails.

(b) Short also maintains that his confession was induced by the remotest fear of injury "because he was at risk of harm by other inmates in the Muscogee County Jail and was induced to confession so as to be placed in protective custody." The facts of this case do not

involve allegations of physical or mental torture by law enforcement officers, and to the extent Short makes a fear of injury argument, it is predicated upon coercion by threats and a theoretical risk of harm at the hands of a third party. Short essentially argues that Detective Carter knew Short was being threatened by other inmates and that Detective Carter used that threat to induce Short's confession.[14] This argument fails because the record does not show actual inducement. See *Pulley*, 291 Ga. at 332 (2) (explaining the need for "a causal connection between the police conduct and the confession"); *Leverette*, 320 Ga. at 821 n.15 (Peterson, P.J., dissenting) (discussing requirement that a "statement actually induce[] the defendant's confession") (citations omitted).

Short testified at the *Jackson-Denno* hearing that Detective

---

[14] While Short presents his "fear of injury" argument on appeal in a manner that is separate and distinct from his "hope of benefit" argument, he blended those arguments below. Because Short testified to the facts underlying his "fear of injury" argument during the *Jackson-Denno* hearing, and because the trial court rejected his generalized arguments under OCGA § 24-8-824 that were based, at least in part, on those predicate facts, we think that the distinct "fear of injury" argument that Short pursues on appeal has been fairly preserved for ordinary appellate review. The trial court's construction of Short's argument poses no issue here since Short's argument fails regardless of its characterization under OCGA § 24-8-824.

Carter offered him "protective custody for [his] cooperation[,]" that Detective Carter made this offer at an unspecified time "in the car[,]" and that he gave his confession "based on those promises." However, the recorded interviews contain minimal discussion of any "fear of injury" on Short's part and no use of that fear on the officers' part to induce a confession. Nearly three hours prior to giving his confession during the December 5 interview, Short raised with the officers the issue of his "housing situation" and alluded to fearing for his safety inside the county jail. This was the only mention of such matters to the officers prior to Short's confession, and Detective Carter responded to Short in that moment that it "must have been over at the jail if they asked you if you felt safe." Short later briefly discussed being in solitary confinement and having some "conflict" with other inmates during lunch with his mother, but at no point do the recorded interviews contain any discussion of what Short testified to at the *Jackson-Denno* hearing.

Therefore, in denying Short's pre-trial motion, the trial court rejected Short's contention that his confession was induced by an

offer of "protective custody for [Short's] cooperation[,]" relying instead on what could be gleaned from the recorded interviews themselves. Under our deferential standard of review, the trial court was free to do so, and Short has not shown that doing so constitutes reversible error in this case. Absent Short's discredited testimony, there is nothing in the record to support his contention that the officers used a fear of injury to coerce and actually induce his confession.

2. Because we conclude that Short's confession was obtained consistent with OCGA § 24-8-824 and that the trial court did not err in concluding otherwise, we need not address Short's derivative argument that the trial court erred by admitting physical evidence (here, the murder weapons) that were recovered as a result of that confession. Such an argument is also foreclosed by our precedent. See *Chulpayev*, 296 Ga. at 784 (3) (b) (concluding that "the fruit of the poisonous tree doctrine does not, as a matter of law, apply to violations of OCGA § 24-8-824").

3. For the reasons stated herein, we conclude that Short's

25

confession was not induced by either a hope of benefit or fear of injury in violation of OCGA § 24-8-824. Therefore, the trial court did not err by admitting Short's confession at trial. We affirm.

*Judgment affirmed. Peterson, CJ, Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur. Warren, PJ, concurs specially in part.*

WARREN, Presiding Justice, concurring specially in part.

Although I agree with the majority opinion's ultimate conclusion that Short's convictions should be affirmed in this case, I respectfully disagree with much of its reasoning in Division 1 and therefore concur specially in that division. In particular, I believe that this Court may review Short's "fear of injury" contention on appeal for plain error only.

Short contends in his appellate brief in this Court that the trial court should not have admitted his confession under OCGA § 24-8-824 on the basis that it "was induced by remotest fear of injury because he was at risk of harm by other inmates in the Muscogee County Jail and was induced to confession so as to be placed in protective custody." But he did not clearly make that argument during the *Jackson-Denno* or in the trial proceedings below. Indeed, Short filed no written motion to exclude his statements under OCGA § 24-8-824, and at the *Jackson-Denno* hearing, Short's counsel cited the statute, offered only a glancing reference to "fear of injury," and then focused almost exclusively on claims pertaining to an

27

impermissible "hope of benefit."[15]

I also am not convinced that the trial court ruled on the "fear of injury" argument under OCGA § 24-8-824 that Short now raises on appeal. In an email to counsel following the hearing, the trial court preliminarily ruled that Short's "custodial statements" "after his advice of rights" were admissible, noting that the statements he made "prior to his advice of rights" would not be admitted.

Then at the beginning of the trial, the trial court admitted

---

[15] In this respect, counsel began his argument by saying that "there [were] several issues. Totality of the circumstances, hope or benefit, promise, threats of harm, any number of issues." He then focused on law enforcement officers' alleged offers of a "hope of benefit," asserting that they offered Short "a plea to a 25-year sentence" and promised to take the death penalty "off the table"—without mentioning the "remotest fear of injury" claim that Short now raises on appeal. To be sure, Short later testified that other inmates at the jail had "threatened" him; he told Detective Carter that he was concerned for his safety; Detective Carter promised Short "protective custody for [his] cooperation"; and Short confessed "based on these promises." But Short did not make clear whether his testimony pertained to a claim of fear of injury or to a claim of hope of benefit (or to both), and trial counsel did not clarify whether Short sought to exclude his confession on the basis of fear of injury. (On this point: after Short testified, the trial court asked if trial counsel wanted to add anything to the record, and counsel said, "No.")

Given all this, it is difficult for me to conclude that the trial court's "express rejection of Short's contrary position and decision to admit Short's confession at trial is, by necessary implication," a ruling that Short's confession was not induced by a fear of injury in violation of OCGA § 24-8-824. Maj. Op. at 18.

28

Short's confession in an oral ruling, saying that Short "knowingly was informed of his rights, waived those rights, and that was done repeatedly, multiple times throughout the interviews," with no mention of OCGA § 24-8-824, "hope of benefit,"[16] or "fear of injury."

Given our admonition that the tests for determining the voluntariness of a confession under OCGA § 24-8-824 and under the Constitution are not the same (and that language about "knowing waiver of rights" typically is responsive to claims about constitutional voluntariness), I have trouble concluding that the trial court implicitly ruled on a fear of injury claim. See, e.g., *State v. Chulpayev*, 296 Ga. 764, 779 (770 SE2d 808) (2015) (explaining the difference between statutory claims based on OCGA § 24-8-824

---

[16] Because Short's trial counsel more clearly raised a hope of benefit argument at the *Jackson-Denno* hearing and sought to exclude Short's confession on that basis, it is possible that the trial court's admission of Short's confession was an implicit ruling on that issue and was thus preserved for ordinary appellate review—although I have my doubts, given that the court's preliminary and oral rulings focused on only Short's waiver of rights and the constitutional voluntariness of his statements (rather than statutory voluntariness under OCGA § 24-8-824). In any event, because Short's hope of benefit claim fails even under ordinary appellate review (as the majority opinion concludes), it would also fail under the more stringent plain-error test. See, e.g., *Sconyers v. State*, 318 Ga. 855, 863 (901 SE2d 170) (2024).

and claims of constitutional voluntariness under the United States Constitution and noting that our decisions have sometimes conflated the analysis of whether a confession is voluntary under the separate standards). As discussed above, trial counsel made no specific argument that Short's confession was induced by a fear of injury, and the context of Short's testimony at the *Jackson-Denno* hearing did not make such a claim "apparent." OGGA § 24-1-103 (a) (1).[17] As I see it, plain-error review applies to Short's fear of injury claim, and Short's claim fails under the second prong of the plain-error test. See *Hassan v. State*, 318 Ga. 673, 677 (899 SE2d 693) (2024) (explaining that under OGGA § 24-1-103 (a) (1), "a trial court's ruling that admits evidence is ordinarily reviewable only where 'a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not

---

[17] Nor can I conclude, as the majority opinion does, that the fear of injury claim Short now raises easily fails under ordinary appellate review because the trial court—in purportedly implicitly ruling on a fear of injury argument that was not clearly presented to it—also implicitly rejected Short's testimony and relied instead on video recordings of law enforcement interviews that "contain minimal discussion of any 'fear of injury.'" Maj. Op. 25-26.

apparent from the context'" and that "[w]ithout preservation of error as provided in OCGA § 24-1-103, an appellate court reviews an evidentiary ruling only for plain error pursuant to OCGA § 24-1-103 (d)"). See also *Mitchell v. State*, 314 Ga. 566, 569 (878 SE2d 208) (2022) (noting that an unpreserved claim that a defendant's confession was induced by a fear of injury, in violation of OCGA § 24-8-824, is reviewable only for plain error).

"To establish plain error, the appellant must point to an error that was not affirmatively waived, and that error must have been clear and not open to reasonable dispute, must have affected the appellant's substantial rights, and must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *Hassan*, 318 Ga. at 677 (cleaned up). "If the appellant fails to meet one element of the plain error test, his claim fails." Id.

Here, Short has not established that the trial court—in failing to determine on its own accord that Short's confession was induced by the "remotest fear of injury" in violation of OCGA § 24-8-824—committed a clear error beyond reasonable dispute. Under our cases

31

interpreting OCGA § 24-8-824, "[t]he 'remotest fear of injury' that renders an incriminating statement involuntary and inadmissible is 'physical or mental torture' or coercion by threats." *State v. Lynch*, 286 Ga. 98, 100 (686 SE2d 244) (2009) (interpreting a former version of OCGA § 24-8-824) (citation omitted). See also *Mitchell*, 314 Ga. at 573 ("'Physical or mental torture is the type of fear of injury that prevents a confession from being admissible' under OCGA § 24-8-824.") (citation omitted). At the *Jackson-Denno* hearing, Short testified, among other things, that he had been threatened by other inmates; he told Detective Carter that he was concerned for his safety in the jail; Detective Carter promised Short "protective custody for [his] cooperation"; and Short confessed "based on these promises." But Short has cited no authority, and I have found none, showing that these particular circumstances obviously "constituted physical or mental torture" or coercive threats "of the type to render an in-custody statement involuntary and inadmissible"—the standard we have said applies to claims of "fear of injury" under OCGA § 24-8-824. *Browner v. State*, 296 Ga. 138, 142 (765 SE2d

348) (2014).  See also *Lynch*, 286 Ga. at 98-101 (affirming the trial court's suppression of  the defendant's statement to detectives because the evidence presented at the suppression hearing supported the trial court's express findings that the detectives beat the defendant, used "a taser," removed his clothes, and withheld medical attention, such that the defendant's statement was induced by the remotest fear of injury under a former version of OCGA § 24-8-824); *Cheddersingh v. State*, 290 Ga. 680, 684-685 (724 SE2d 366) (2012) (explaining that under the plain-error test, the error must be so obvious that "'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it'") (quoting *United States v. Frady*, 456 U.S. 152, 163 (102 SCt 1584, 71 LE2d 816) (1982)). And because under the particular circumstances presented in this case, Short has not met his burden of establishing that the trial court clearly erred by failing to exclude his confession on the ground that it was induced by the "remotest fear of injury" in violation of OCGA § 24-8-824, Short has failed to

establish that the trial court plainly erred in this regard.[18]

---

[18] To be clear, I do not intend to suggest that a criminal defendant could *never* establish a fear of injury claim under OCGA § 24-8-824 by alleging that his fear was caused by an act of a third party (such as an inmate).  Indeed, the plain text of the statute does not appear to require that the defendant's confession be induced by a State actor.  See OCGA § 24-8-824 ("To make a confession admissible, it shall have been made voluntarily, without being induced *by another* by the slightest hope of benefit or remotest fear of injury.") (emphasis added).  I merely conclude that Short's testimony, by itself and as presented to the trial court here, did not clearly and obviously establish a fear of injury under our current case law, so the trial court did not plainly err by failing to exclude Short's confession under OCGA § 24-8-824 on that basis.

I also note that Short does not contend that Detective Carter's alleged offer to place Short in protective custody in exchange for cooperation in the murder investigation constituted a hope of benefit under OCGA § 24-8-824.  In any event, under our current case law, such an offer would not constitute a hope of benefit.  See, e.g., *State v. Leverette*, ___ Ga. ___, ___ (912 SE2d 533, 537) (2025) (explaining that a hope of benefit is a "'promise[ ] related to reduced criminal punishment—a shorter sentence, lesser charges, or no charges at all'") (citation omitted).  But see id. at 547 n.17 (Peterson, PJ, dissenting) (asserting that our case law has "repeatedly parrot[ed]" the "unsupported assertion" that a hope of benefit under OCGA § 24-8-824 must relate to the charge or sentence facing the suspect).

34